UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Nos. 16-16731, 16-17035, 16-17129, 16-17133,
16-17155, 16-17157, 16-17158,
16-17166, 16-17168, 16-17181, 16-17183, 16-17185

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES
PRACTICES, AND PRODUCTS LIABILITY LITIGATION

JASON HILL, *et al.*,

*Plaintiffs-Appellees,*

v.

VOLKSWAGEN AG, *et al.*,

*Defendants-Appellees.*

Appeals from the U.S. District Court for the Northern District of California
The Honorable Charles R. Breyer
District Court Case No. 3:15-MDL-2672-CRB

**CONSOLIDATED ANSWERING BRIEF OF PLAINTIFFS-
APPELLEES**

Elizabeth J. Cabraser
David S. Stellings
Kevin R. Budner
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

*Plaintiffs-Appellees' Lead Counsel
(additional counsel of record listed
on signature page)*

# CORPORATE DISCLOSURE STATEMENT

No Plaintiff-Appellee is a corporation in this case.  Therefore, no corporate disclosure statement is required under Rule 26.1 of the Federal Rules of Appellate Procedure.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

COUNTERSTATEMENT OF THE ISSUES...........................................................1

COUNTERSTATEMENT OF THE CASE...........................................................5

    I.     The Settlement Has Proved a "Spectacular" Success. ........................5

    II.    The Settlement Resulted from Vigorous Litigation and Intensive, Arm's-Length Negotiations, Conducted in Coordination with Government Entities, and Overseen by Settlement Master Robert Mueller, III. .................................9

    III.   The District Court Carefully Reviewed the Settlement and, After Thorough Findings of Fact and Comprehensive Analysis of All Objections, Granted Final Approval. .......................................12

SUMMARY OF ARGUMENT ...........................................................16

STANDARD OF REVIEW ...........................................................24

ARGUMENT ...........................................................25

    I.     Appellants Ancona, D'Angelo, Sodamin, Chechik, Siewert, and the Lujan Appellants Have Accepted Their Settlement Offers and Executed Binding Individual Releases—They Have No Standing to Appeal. .......................................25

    II.    The District Court Correctly Approved a Settlement Creating and Enforcing a $10.033 Billion Remedial Commitment...................26

         A.    There Is No Reversionary Component to the Settlement. .......26

         B.    There Is No Evidence of Collusion..........................................33

    III.   The Settlement's Buyback Valuation is Considerably Above Market Value, and No One with Standing Has Challenged the Valuation. .......................................34

    IV.   The Settlement Provides a Fair Formula for Compensating Eligible Sellers, and the District Court Properly Exercised its Discretion by Approving It. .............................................40

    V.    The Scope of the Release is Appropriate, and the District Court Properly Exercised its Discretion by Approving It. ...........................42

VI.   The District Court Properly Rejected the Claim That Volkswagen Must Indemnify Class Members Against Frivolous Litigation. .........................................................................................44

VII.  The District Court Did Not Err by Setting Different Schedules for the Briefing of, and Objections to, the Final Approval of the Settlement and Class Counsel's Fee Application. ............................45

VIII. The Court Did Not Abuse its Discretion in Concluding the "Segregated" Fee Structure Did Not Harm the Class. .......................50

IX.   Volkswagen's Agreement to Pay Class Counsel's Reasonable Attorneys' Fees and Costs Did Not Create an Intra-Class Conflict. .............................................................................................52

X.    Appellant Fleshman's Argument That the Settlement Violates the Clean Air Act and Virginia State Implementation Plan Is Wrong and Does Not Require Reversal of the Settlement.................55

XI.   The District Court Adequately Reviewed and Properly Overruled Appellant Weese's Objection Regarding Existing "Liens."...............................................................................................59

XII.  Appellant Kangas Did Not Demonstrate He Was Entitled to Discovery, and the District Court Properly Denied His Request.......61

CONCLUSION ......................................................................................................65

# TABLE OF AUTHORITIES

**Page**

## CASES

Allen v. Bedolla,
787 F.3d 1218 (9th Cir. 2015) ............................................................49, 50

Amchem Products, Inc. v. Windsor,
521 U.S. 591 (1997).............................................................................51

Armentero v. INS,
412 F.3d 1088 (9th Cir. 2005) ...............................................................55

Barboso v. Cargill Meat Sols. Corp.,
297 F.R.D. 431 (E.D. Cal. 2013) ............................................................42

Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n,
366 F.3d 692 (9th Cir. 2004) ...........................................................31, 32

Casey v. Citibank, N.A.,
No. 1:13-CV-353, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014) .............62

Charron v. Wiener,
731 F.3d 241 (2d Cir. 2013) ..................................................................62

Churchill Vill., L.L.C. v. Gen. Elec.,
361 F.3d 566 (9th Cir. 2004) ...........................................................14, 33

Evon v. Law Offices of Sidney Mickell,
688 F.3d 1015 (9th Cir. 2012) ...............................................................38

Exxon Mobil Corp. v. U.S. Environmental Protection Agency,
217 F.3d 1246 (9th Cir. 2000) ...............................................................58

Four in One Co., Inc. v. S.K. Foods, L.P.,
No. 2:08-CV-3017 KJM EFB, 2014 WL 4078232
(E.D. Cal. Aug. 14, 2014).......................................................................42

Gallucci v. Gonzales,
603 F. App'x 533 (9th Cir. 2015).............................................................64

Girsh v. Jepson,
521 F.2d 153 (3d Cir. 1975) ..................................................................62

*Halley v. Honeywell Int'l, Inc.*,
No. 16-2712, 2017 WL 2802638 (3d Cir. June 29, 2017) ..........................43

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......................................................25, 38, 42

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ......................................................................38

*Hemphill v. San Diego Ass'n of Realtors, Inc.*,
225 F.R.D. 616 (S.D. Cal. 2005) ................................................................61

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ......................................................................38

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ............................................................. passim

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005) ................................................................61, 62

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 4:13-md-02420-YGR (DMR), 2017 U.S. Dist. LEXIS 45696
(N.D. Cal. Mar. 20, 2017)............................................................................42

*In re LivingSocial Mktg. & Sales Practice Litig.*,
298 F.R.D. 1 (D.D.C. 2013) ........................................................................63

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ................................................................24, 25

*In re Mercury Interactive Corp. Sec. Litig.*,
618 F.3d 988 (9th Cir. 2010) ............................................................. passim

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ............................................................... passim

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico,
on Apr. 20, 2010*,
910 F. Supp. 2d 891 (E.D. La. 2012) .........................................................46

*In re Volkswagen "Clean Diesel" Litig.*
No. CL-2016-9917 (Fairfax Cnty. & City Cir. Ct. Aug. 30, 2016) .......56, 57

*Joel A. v. Giuliani*,
218 F.3d 132 (2d Cir. 2000) ........................................................................39

*Jones v. Amalgamated Warbasse Houses, Inc.*,
97 F.R.D. 355 (E.D.N.Y. 1982), *aff'd*,
721 F.2d 881 (2d Cir. 1983) ........................................................................64

*Kullar v. Foot Locker Retail, Inc.*,
168 Cal. App. 4th 116 (2008) ......................................................................61

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) .......................................................................25

*Lewis v. Continental Bank Corp.*,
494 U.S. 472 (1990)......................................................................................35

*Milano v. Interstate Battery Sys. of Am.*,
No. 10-CV-2125-CW, 2012 U.S. Dist. LEXIS 93201
(N.D. Cal. July 5, 2012)................................................................................42

*National Super Spuds, Inc. v. New York Mercantile Exchange*,
660 F.2d 9 (2d Cir. 1981) ............................................................................39

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)......................................................................................41

*Peterson v. Highland Music, Inc.*,
140 F.3d 1313 (9th Cir. 1998) .....................................................................53

*Taylor v. W. Marine Prods., Inc.*,
No. C 13-04916 WHA, 2015 WL 307236 (N.D. Cal. Jan. 20, 2015)..........42

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993) .........................................................................59

*UniSuper Ltd. v. News Corp.*,
898 A.2d 344 (Del. Ch. 2006) ...............................................................43, 44

## STATUTES

42 U.S.C. § 7543(a) ..............................................................................................58

Clean Air Act § 209(a)........................................................................................57

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(a)............................................................................................13

Fed. R. Civ. P. 23(a)(3)........................................................................................20

Fed. R. Civ. P. 23(b)(3)........................................................................................14

Fed. R. Civ. P. 23(c)............................................................................................14

Fed. R. Civ. P. 23(e)........................................................................................14, 65

Fed. R. Civ. P. 23(h) .......................................................................................46, 50

Fed. R. Civ. P. 23(h)(1)........................................................................................48

## OTHER AUTHORITIES

Press Release, Commonwealth of Virginia Office of the Attorney
    General, *Herring Announces Compensation for Virginia
    Consumers Under Settlements with Volkswagen Over Emissions
    Fraud* (June 28, 2016), *available at* http://ag.virginia.gov/media-
    center/news-releases/773-june-28-2016-herring-announces-
    compensation-for-virginia-consumers-under-settlements-with-
    volkswagen-over-emissions-fraud..................................................................60

Rebecca R. Ruiz and Mark Landler, *Robert Mueller, Former F.B.I.
    Director, Is Named Special Counsel for Russia Investigation*, The
    New York Times (May 17, 2017), available at
    https://www.nytimes.com/2017/05/17/us/politics/robert-mueller-
    special-counsel-russia-investigation.html .....................................................69

U.S. Envtl. Protection Agency, EPA, California Notify Volkswagen of
    Additional Clean Air Act Violations (Nov. 2, 2015), *available at*
    https://www.epa.gov/newsreleases/epa-california-notify-
    volkswagen-additional-clean-air-act-violations ............................................60

Page

U.S. Envtl. Protection Agency, Frequent Questions about Volkswagen
    Violations, https://www.epa.gov/vw/frequent-questions-about-
    volkswagen-violations (last visited Aug. 29, 2016) .....................................60

## COUNTERSTATEMENT OF THE ISSUES

These appeals serve no legitimate purpose under Rule 23. The Class has the information and incentives it needs to act on the Settlement and has done so in droves. Hundreds of thousands of Class Members have already taken steps to claim and obtain the compensation and remediation the Settlement offers, and many more are in progress. By the time this Court is prepared to rule, the issues on appeal will be irrelevant.

This is not hyperbole. The levels of participation are extraordinary. More than two thirds of the Class of 490,000 had registered for Settlement participation *even prior to final approval*. Now, eight months into the remediation period, the claims are well ahead of schedule. As the district court overseeing the implementation of the Settlement recently observed, "from a consumer's point of view much of the business has been finished."[1] Plaintiffs-Appellees' Excerpts of the Record ("P.A.E.R.") 1208 [Dist. Dkt. 3395 at 64:6-7].

At the time of this filing, over 300,000 Class Members have turned in their vehicles or had emissions repairs performed—and have received over $6.3 billion in compensation. More than 108,000 *additional* Class Members have submitted

---

[1] The district court oversees the implementation of claims payment through monthly and quarterly Claims Supervisor reports and regular status conferences. All pertinent transcripts, orders, settlement agreements, briefs, executive summaries, class notices, and quarterly status reports are docketed and posted on the district court's website, http://cand.uscourts.gov/crb/vwmdl, for ready access by Class Members.

claims that are being processed and reviewed.  Adding outstanding offers on claims made and in process, the Settlement payout currently totals over $7 billion—70% of the funding commitment—only one third of the way into the 23-month claims period.  P.A.E.R. 1114, 1126 [Dist. Dkt. 3370 at 4, 16].

The Settlement is succeeding, in no small part, because the compensation is generous and efficiently administered.  In the words of one Class Member who wrote to Class Counsel upon turning in her 2015 Jetta TDI: "By afternoon, I was able to drive back home in a 2017 metallic blue Jetta with the complete safety package that was my reason for buying the car in the first place. The buyback of my original car plus the [restitution] that Volkswagen paid covered the new car as well as six years of prepaid annual service."  P.A.E.R. 1124 [Dist. Dkt. 3370 at 14].  The vast majority of the Class is thrilled with the Settlement's terms and implementation; a very small, but vocal, minority is not.

There is always a paradox in objections to class actions settlements.  If objectors were concerned only with their well-being, they could opt out.  But objectors choose voice, and offer their views as meriting greater weight than those of the counsel that negotiated the settlement and the court that approved it.  In effect, objectors offer themselves as more suitable guardians of the Class' interests than the Class' court-appointed fiduciaries or the vast majority of the Class itself.

They do so out of a variety of motives. Some objectors are earnest, some are ideologically opposed to class actions, and some are strategic abusers of the system who seek to put a wrench in the gears in the hope of breaking off some piece of the deal for their own gain. Regardless of their motives, the objectors' claim is that the Class needs better representation and that Class Members are generally incapable of making the kinds of decisions necessary to evaluate the deal.

These objections may hold some water in low-value consumer cases that merit neither individual prosecution nor individual attention; they have absolutely no bearing here. In this extremely well-publicized case, objectors were not the only ones paying attention. Virtually every Volkswagen diesel owner or lessee knew about and paid attention to the progress of the litigation. Americans care greatly about their cars—typically the second most valuable possession of any family.[2] And the cars in question were sold to a population that valued the benefits of diesel engines and the putative environmental protections offered by Volkswagen. This Class is both engaged and enraged by what happened. Their participation in effectuating the largest vehicle buyback in U.S. litigation history shows it. As of the latest filing in the district court, there had been nearly 408,000

---

[2] The district court understood this importance, recognized the Settlement's attention to these interests, and has supervised its implementation to ensure they are satisfied. P.A.E.R. 1187-1208 [Dist. Dkt. 3395 at 43:23-64:12].

claims already been made,[3] hundreds of thousands of calls to the Volkswagen hotline, over 100,000 communications with Class Counsel, and millions of visits to the Settlement Website.[4]  P.A.E.R. 1112-28, 1196 [Dist. Dkts. 3370 at 2-18, 3395 at 52:17-19].

The Class has spoken for itself and has no need of its putative guardian objectors.  To the claims that the notice is insufficient, or that the Settlement is illusory, or that the offers cannot withstand regulatory scrutiny, the actions of the Class answer simply and clearly: nonsense.  When the Class participates so overwhelmingly in the settlement approval process, there is no room for would-be knights errant.  At the pace of current remediation, the only Class Members

---

[3] A key feature of the Settlement—to fulfill the overarching goal of the "Clean Diesel" MDL proceedings to "get[] the polluting cars fixed or off the road," P.A.E.R. 69 [Dist. Dkt. 1384 at 8:20-21]—was the opening of a claims portal during the Settlement approval process and the launch of the buyback and claims payment program immediately upon district court final approval.  Class Member participation was intense and immediate, flooding the initial capacities of the system, and requiring the addition of substantial personnel and resources to meet consumer demand.  P.A.E.R. 1188-89 [Dist. Dkt. 3395 at 44:19-45:18].

[4] The Settlement provides for an internal claims review process to consider and decide consumer claims or issues arising from the buyback, repair, and payment process.  The Claims Review Committee—a three person, court-appointed board comprised of one Settlement Class Counsel representative, one Volkswagen representative, and one neutral (a retired federal district judge)—review such requests, which to date comprise less than 0.3% of claims paid.  P.A.E.R. 1121 [Dist. Dkt. 3370 at 11].

remaining outside the Settlement by the time this appeal is resolved may well be the eleven appellants.[5]  They should have just opted out.

## COUNTERSTATEMENT OF THE CASE

## I.    The Settlement Has Proved a "Spectacular" Success.

This Settlement is as successful as it is unique.  Valued at up to $10.033 billion, it is likely the largest consumer class action settlement in history. Critically, it empowers car owners and lessees affected by the Volkswagen TDI "Clean Diesel" scheme to make their own choices about whether and when to sell their cars back to Volkswagen or have them fixed—and it compensates them generously under both options.

It does so at a speed unprecedented for a case of this size and complexity. The parties filed the Settlement on June 28, 2016—little more than nine months after the "Clean Diesel" exposé, and less than seven months after the district court appointed Class Counsel.  By the beginning of November 2016, less than a week after the Settlement received final approval, it was up and running at full speed.

All of this was designed to satisfy the Class' demand for choice, for fair compensation, and for an efficient program to get the polluting cars quickly fixed or taken off the road.

---

[5] Actually, six of them have already accepted offers and signed individual releases.

Unsurprisingly, then, the Class Members' response has been overwhelmingly positive. This is evidenced not just by their words, but by their actions. Approximately 340,000 Class Members—about two thirds of the Class— had registered for class benefits *even before the Settlement received final approval*. P.A.E.R. 1117 [Dist. Dkt. 3370 at 7]. Now, approximately eight months into the Settlement program, over 408,000 Class Members have made claims. P.A.E.R. 1196 [Dist. Dkt. 3395 at 52:17-19]. The participation rate has exceeded even the most optimistic expectations.

Although the Settlement is designed to work as efficiently as possible, executing the buyback of a tangible asset as valuable as a car is not an administratively simple task, to say the least, especially given the degree of coordination that is required between the Class Members, Volkswagen, the dealerships, and in some cases, financial institutions (the buyback transaction pays off auto lender liens).[6] The mechanical task of turning in hundreds of thousands of cars to dealerships and then storing them is itself a complex undertaking requiring fleets of vehicle transporters, leases of massive parking facilities, and the immediate availability of substitute vehicles. The design, approval, and

---

[6] The realities of returning vehicles from remote areas with no nearby dealerships, of accommodating the needs and convenience of U.S. servicepersons overseas, and providing for those who bought their cars in the U.S. but registered them in Canada were also addressed by the parties through the Settlement implementation process. P.A.E.R. 1119-20 [Dist. Dkt. 3370 at 9-10].

installation of complex engine modifications is also a complicated endeavor.  Yet, as of June 23, 2017, the Settlement Program had already yielded impressive results, paying over 309,000 claims, including:

- *275,601 completed vehicle buybacks*;

- 2,171 fully completed vehicle emissions modifications;

- 8,372 partially completed vehicle emissions modifications;

- 10,027 early lease terminations; and

- 12,936 completed claims for former owners and former lessees.

P.A.E.R. 1114, 1126, 1140 [Dist. Dkts. 3370 at 4, 16; 3370-1 at 1].  This overview depicts the big picture:



P.A.E.R. 1144 [Dist. Dkt. 3370-3]. These figures grow daily.

In other words, less than a third of the way through the claims period—and with more than a year and a half left to go—approximately two thirds of the Class has already shown up, completed their claims, and received their remedies. Together, they have been paid approximately $6.3 billion by Volkswagen. P.A.E.R. 1114 [Dist. Dkt. 3370 at 4]. As of June 15, 2017, 8,675 additional closing appointments had already been scheduled, and Volkswagen had extended additional offers totaling approximately $785 million. *Id.*

In stark contrast, only about 3,300 potential Class Members opted out of the Settlement—less than 0.7% of the Class. Kangas E.R. 4 [Dist. Dkt. 2102 at 4].[7] And, notably, 425 of them (about 13%) have changed their minds and opted back in. P.A.E.R. 1199-1200 [Dist. Dkt. 3395 at 55:24-55:5].[8]

In light of this historic reception, the district court recently remarked that this Settlement and its implementation is more than just fair, reasonable, and

---

[7] Appellants have filed numerous and overlapping excerpts of the record. All documents contained in the excerpts accompanying the first-filed appeal of the final approval order are marked "Kangas E.R." Citations to other appellants' excerpts are so marked.

[8] This remains an open opportunity. P.A.E.R. 1200-02 [Dist. Dkt. 3395 at 55:24-58:24]. In this case, opting out is not a meaningless right. The claims are large enough to be feasibly prosecuted, and several hundred opt outs are proceeding on their claims in consolidated Virginia state-court proceedings.

adequate; in his words, it has been "spectacular."  P.A.E.R. 1187 [Dist. Dkt. 3395 at 43:24].

## II. The Settlement Resulted from Vigorous Litigation and Intensive, Arm's-Length Negotiations, Conducted in Coordination with Government Entities, and Overseen by Settlement Master Robert Mueller, III.

This Settlement did not come easy.  From the very beginning of the MDL proceedings, the district court was clear that it expected the parties to work tirelessly towards a comprehensive resolution.  *See, e.g.*, P.A.E.R. 25 [Dist. Dkt. 1270 at 6:9-12].  The environment could not wait.  As a result, the district court set an aggressive litigation schedule, and directed the parties to prepare for trial as early as the summer of 2016, in the event a resolution could not be reached.  P.A.E.R. 69 [Dist. Dkt. 1384 at 8:6-21].  Class Counsel set to work, drafting a 719-page consumer complaint and an 83-page reseller dealer complaint; filing substantive amendments to those complaints; serving and responding to voluminous discovery requests; reviewing, analyzing, and coding many of the more than 12 million pages of documents produced by Volkswagen, many in German; drafting a motion for class certification; working closely with technical experts; and preparing a trial plan, among other things.

At the same time, however, the parties began immediate settlement negotiations overseen by the Settlement Master, former F.B.I. director Robert Mueller, III.  These negotiations were extraordinarily intense and complex,

especially considering the number of issues and parties involved, including not only Volkswagen and Class Counsel, but also the Department of Justice ("DOJ") on behalf of the Environmental Protection Agency ("EPA"), the California Attorney General on behalf of the California Air Resources Board ("CARB"), and the Federal Trade Commission ("FTC").  As Settlement Master Mueller acknowledged, the "settlement process involved at least 40 meetings and in-person conferences at various locations, including San Francisco, New York City, and Washington, DC, over a five-month period. A number of these sessions lasted many hours, both early and late, and weekends were not excluded."  P.A.E.R. 245 [Dist. Dkt. 1977 ¶ 5].

Ultimately, these efforts "bor[e] fruit," in the words of the district court. Fleshman E.R. 2461 [Dist. Dkt. 1535 at 8:8-18].  The fruit took the form of a trio of interrelated settlements filed in the district court on June 28, 2016—the consumer Class Settlement, Kangas E.R. 49 [Dist. Dkt. 1685] (as amended), the DOJ Partial Consent Decree, Kangas E.R. 172 [Dist. Dkt. 1605], and the FTC Order, P.A.E.R. 85 [Dist. Dkt. 1607] (collectively, the "Settlements").  Together, they secured Volkswagen's commitment to compensate consumers and to restore the environment.

As to compensation, the Class Settlement requires Volkswagen to buy back or modify the 2.0-liter TDI vehicles to meet operative federal and state NOx

emissions standards.[9] Getting the vehicles fixed or off the road hinged on the owners' and lessees' own voluntary choices, and the Settlement incentivized consumers to take these affirmative actions by offering each Class Member the alternatives of generous buyback compensation pegged to the pre-scandal market value of their vehicles plus additional cash compensation, or cash compensation plus extended warranties if a Class Member chose to direct Volkswagen to modify her car to meet emissions standards. What choice to make, and when to make it, belongs to each Class Member. And, importantly, Volkswagen committed to the $10.033 billion necessary to fully fund the Settlement if 100% of the vehicle owners opted for a buyback. Thus, the level of Class Member participation does not affect any individual Class Member's benefits.[10]

In addition to the compensation available to consumers, the Settlements require Volkswagen to pay $2.7 billion into an environmental remediation trust to mitigate the Class Vehicles' excess emissions and invest $2 billion to promote the use of zero emissions vehicles. *See, e.g.*, Kangas E.R. 186-88 [Dist. Dkt. 1605 at

---

[9] The 3.0-liter TDI vehicles are covered by a separate settlement, P.A.E.R. 694 [Dist. Dkt. 2894], which the district court also granted final approval, P.A.E.R. 1056 [Dist. Dkt. 3229], and which has not been appealed.

[10] As of June 15, 2017, about 96.32% of owners had chosen a buyback (275,601 buybacks / (296,171 vehicle transactions – 10,027 early lease terminations)), and 3.68% had chosen modification. P.A.E.R. 1140 [Dist. Dkt. 3370-1 at 1]. These choices remain open through September 2018. Kangas E.R. 53 [Dist. Dkt. 1685 at ¶ 2.11].

13-15].  This environmental remediation was also critical for a Class of consumers

who purchased these cars in large part due to their supposedly "green" credentials.

**III.** **The District Court Carefully Reviewed the Settlement and, After Thorough Findings of Fact and Comprehensive Analysis of All Objections, Granted Final Approval.**

The district court was no passive observer in the Settlement process.

Settlement Master Mueller worked closely with the parties throughout the

settlement negotiations, and—at the request of the district court, and the

authorization of the parties—he regularly updated the court on both the process

and substance of the negotiations.  *See, e.g.*, P.A.E.R. 69 [Dist. Dkt. 1384 at 8:6-

21] ("The Court: . . . I'm asking Director Mueller to . . . give me weekly updates

the status of the parties' discussions and the concrete plan to get the cars off the

road or fixed.").  Thus, when it came time to review the Settlement, the district

court did so from an unusually informed perspective, as reflected in its orders.  In

the 32-page order granting preliminary approval, the district court examined the

Settlement's provisions and the procedure by which the Settlement was reached

and found "[t]he Settlement [to be] sufficiently fair, adequate, and reasonable to

the 2.0-liter diesel engine vehicle consumers to move forward with class notice."

Kangas E.R. 2090-2091 [Dist. Dkt. 1688 at 1-2].

The class notice that followed was state of the art.  It included a detailed and

frequently-updated Settlement Website (www.vwcourtsettlement.com), a robust

publication and media program and, critically, individually mailed and e-mailed notifications, among other forms of notice. P.A.E.R. 247-317 [Dist. Dkt. 1978]. To quantify the scope and scale of the notice program: (a) 811,944 notice packets were directly mailed to Class Members and dealers; (b) 453,797 email notifications were sent to Class Members that included both the Short and Long Form Notices designed to substantial information, including specific instructions for Class Members to follow to exercise their rights; (c) 125 strategically-placed print notifications were placed in national and regional publications with circulations in the millions were published; and (d) more than 112,582,506 digital impressions were published on dozens of relevant Internet websites and on leading social media platforms, including Facebook, Instagram, and Twitter. *Id.* The exceptionally high level of active Class Member response to the notice campaign demonstrates its effectiveness.

After receiving notice, the overwhelming majority of the Class have registered and made claims, while less than 0.7% of them opted out, and less than 0.1% objected to any aspect of the Settlement. All of these objectors were permitted to address the district court in person at a fairness hearing (although most elected not to do so), after which the district court entered its 48-page order granting final Settlement approval. Kangas E.R. 1-48 [Dist. Dkt. 2102]. In that order, the court confirmed its findings that the Class satisfied Rule 23(a) and

23(b)(3), and that the extensive notice given to the Class satisfied Rule 23(c). Kangas E.R. 9-14 [Dist. Dkt. 2102 at 9-14]. The district court then analyzed the factors outlined in *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) to determine whether the Settlement was fair, reasonable, and adequate under Rule 23(e), and the factors used to evaluate evidence of collusion or other conflicts of interest outlined in *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). Kangas E.R. 42-44 [Dist. Dkt. 2102 at 42-44]. The district court also carefully considered the objections of Class Members, including those before this Court. Kangas E.R. 23-42 [Dist. Dkt. 2102 at 23-42].

Notably, in the course of this analysis, the district court made the following findings of fact, among others:

- "The Settlement adequately and fairly compensates Class Members" and "[t]he Settlement offers Class Members relief that is fair and adequate." Kangas E.R. 19, 21 [Dist. Dkt. 2102 at 19, 21];

- "Class Counsel . . . had sufficient information to make an informed decision about the Settlement." Kangas E.R. 22 [Dist. Dkt. 2102 at 22];

- "Class Members . . . had sufficient information as to Class Counsel's prospective [fee] request prior to the Opt-Out Deadline." Kangas E.R. 38 [Dist. Dkt. 2102 at 38];

- "[T]he Settlement is not unfair simply because it does not require Volkswagen to pay the private attorneys' fees of those Class Members who chose to retain an attorney." Kangas E.R. 39 [Dist. Dkt. 2102 at 39];

- "No federal or state authority has declared the Eligible Vehicles illegal to drive." Kangas E.R. 40 [Dist. Dkt. 2102 at 40];

- "It would . . . waste resources if Class Counsel allowed any Class Member to conduct discovery into the settlement negotiations, particularly when the Class Member did not provide a basis to do so." Kangas E.R. 42 [Dist. Dkt. 2102 at 42];

- The Settlement presented "no evidence of collusion." Kangas E.R. 44 [Dist. Dkt. 2102 at 44];

- "[T]hat dialogues for attorneys' fees began after the parties filed the Settlement suggests Class Counsel did not accept an excessive fee in exchange for an unfair settlement or otherwise allow their fees to interfere with their negotiations for Class Members' benefits. As such, this factor is not indicative of collusion." Kangas E.R. 43 [Dist. Dkt. 2102 at 43];

- "While reversionary provisions can sometimes be problematic, that is not the case here." Kangas E.R. 44 [Dist. Dkt. 2102 at 44]; and

- "[T]he Settlement is not the result of, or was influenced by, collusion." Kangas E.R. 44 [Dist. Dkt. 2102 at 44].

The district court then granted final approval to the Settlement, and these consolidated appeals followed.[11] Meanwhile, the buyback, repair, and compensation program detailed in the Settlement sprang into action, under the watchful eyes of Class Counsel and the government plaintiffs, the court-appointed

---

[11] Two of the consolidated appeals were taken not from the Settlement approval order, but from related district court orders. Appellant Partl appealed the district court's denial of her motion to opt out after the opt-out deadline had expired. Partl E.R. 39 [Dist. Dkt. 2119]. Part of Appellant Kangas' appeal relates to the district court's denial of his motion to conduct settlement-related discovery. Kangas E.R. 2046 [Dist. Dkt. 1746].

Claims Supervisor (which submits monthly and quarterly audit reports to the court, *see* Kangas E.R. 75 [Dist. Dkt. 1685 at 27]), and the district court itself (which has included Settlement progress reports on its ongoing conference agendas). *See* P.A.E.R. 324, 448-54, 675-90, 973-75, 1187-1208 [Dist. Dkts. 2166 at 7:6-10-22; 2757 at 9:11-14:2; 2801 at 26:21-41:8; 2917 at 77:24-79:19; 3395 at 43:22-64:12].

## <u>SUMMARY OF ARGUMENT</u>

Out of a Class with approximately 490,000 members, eleven appealed. All run up against the reality that most Class Members, including most appellants, have already embraced the Settlement, claimed their remedies, and moved on.

Broadly speaking, appellants' arguments fall into five categories: (1) the so-called "reversion" clause; (2) the remedy compensation formulas; (3) the scope of the release; (4) the structure and timing of Class Counsel's fee motion; and (5) the alleged "illegality" of the Settlement. Two additional appeals relate to: (6) the denial of settlement-related discovery; and (7) the denial of a belated motion to opt out of the Settlement. The last is addressed separately in Defendants-Appellees' answering brief. The rest are summarized below.

**(1) "Reversion."** Some class action settlements are less than they appear to be, coupling an apparent large payout with hard-to-redeem coupons that leave the putative recovery back in the hands of the defendant. There is a substantial body of case law that addresses such reversionary settlements. The cry of "reversion"

thus provides an off-the-rack standard objection—but it does not apply here. The simple response to the "reversion" epithet here is that over $6.3 billion has already been paid, another $1 billion or more will likely have been paid before this briefing cycle is over, and that the substantial majority of Class Members have already received real benefits, just as the Settlement promised.[12]

The claim of an illicit reversion ignores this reality, and turns on a misunderstanding of the Settlement. Volkswagen created a fund sufficient to buy back every vehicle in question and pay additional benefits. Because this is a finite Class for economic harms, that number could be calculated with precision. Hence the Settlement allowed up to a maximum of $10.033 billion to cover a buyback of every car—if that is what the Class Members chose.

Critically, however, the engine that drives this Settlement is consumer choice. Because some Class Members (including several appellants) will choose and have chosen to keep their cars to have them fixed rather than bought back, it is true that Volkswagen will not end up paying the full $10.033 billion. But it is going to get very close. With two thirds of the Settlement claim period left to go, Volkswagen has already paid or made individual offers to pay more than $7

---

[12] Delivery of these benefits began quickly, mere days after final approval was granted, and well before the deadline to file notices of appeal. By December 2016, a month into the buyback program, over 18,500 buyback appointments *per week* were being completed. P.A.E.R. 1117 [Dist. Dkt. 3370 at 7].

billion.  Many more claims are in process, and there is still a year and a half left to go.

In a true reversionary settlement, the defendant agrees to an inflated figure with a wink and a nod.  Here, by contrast, Volkswagen is heavily invested in the Settlement's success—both because its reputation is on the line and because the related DOJ/EPA Settlements impose stiff fines if the company fails to meet its target recall rate of 85% of the vehicles.  Contrary to the appellants' assertions, those fines are both enforceable and sufficient, as the record to date demonstrates.

**(2) Remedy compensation formulas.**

Another off-the-rack objection to any class action settlement is to ask, albeit less politely than Oliver Twist, that there should be more.  In this vein, the Lujan Appellants complain that the compensation is insufficient because it does not do a vehicle-by-vehicle calculation to measure every single dealer customization or add-on.  In the spirit of the perfect being the enemy of the good, these appellants would crater the Settlement's objectives of rapid environmental protection and immediate compensation to the Class in favor of a protracted administrative process involving one-by-one inspection and valuation of almost half a million cars.

But this is no workhouse porridge deal.  The Settlement is designed to offer fair value to nearly a half million vehicle owners.  This is an extraordinary

undertaking, and the key to its success was a formula that offered generous compensation in a way that could be calculated quickly, without excessive administrative burdens. To this end, the buyback compensation formula offers a baseline payment that, for every vehicle in the Class, *substantially exceeds* the pre-scandal "clean trade" (highest trade-in value) market value of the vehicles, *regardless of their actual condition*. Indeed, the combined buyback payment totals a *minimum* (and in many cases, considerably more than) of 112.6% the vehicles' September 2015 "clean retail" value. Kangas E.R. 700 [Dist. Dkt. 1976 at 13]. Thus, the Settlement bakes in sufficient compensation to account for any particularized customization of the cars, without imposing the administrative burdens and resulting delay that would accompany a vehicle-by-vehicle inspection. Thus, district court did not abuse its discretion by overruling this objection, especially given that "offer[ing] compensation for aftermarket add-ons [would] complicate[] the claims process and risk[] delaying Class Members' payments." Kangas E.R. 33 [Dist. Dkt. 2102 at 33].

In short, appellants present four variants of the more-is-more argument. As noted, the Lujan Appellants demand the value of vehicle anti-theft devices they purchased through their dealer. For the reasons discussed above, this argument lacks merit. The same appellants demand a subclass for each category of add-ons, dressing up this demand in the language of the typicality requirement of Rule

23(a)(3). The proposed requirement far exceeds any logical interpretation of the Rule. Appellant Johnson seeks more money for those who sold their vehicles before the Settlement was filed. But this one appellant's desire for more money does not threaten the reasonableness of the negotiated Class-wide compensation formula. Finally, Appellant Weese says additional compensation should be paid for Class Members whose cars are encumbered by liens, somehow believing that owning less of a defective car should result in more compensation than complete ownership. This argument, too, cannot withstand scrutiny.

The district court did not abuse its discretion in overruling each of these objections and finding that the compensation offered was adequate for all Class Members.[13] If the Settlement did not work for these individuals for idiosyncratic reasons (which have been rebutted by the operation of the Settlement), they should have opted out. The good news is they can all still make claims, and at least six of them already have.

**(3) Release.** The Settlement release extends to all non-personal injury claims related to the "2.0-liter TDI matter"—the nucleus of facts upon which the claims are based—whether known or unknown. This release does nothing more than state the normal scope of res judicata. Its scope is both customary and

---

[13] Indeed, as Class Members have reported, the buyback compensation enables the purchase of a newer, better-equipped car. P.A.E.R. 1197-99 [Dist. Dkt. 3395 at 53:12-55:18].

- 20 -

reasonable, contrary to the assertions of Appellants Fleshman and Kangas.

Appellant Kangas also argues that the release is fatally flawed because it does not

require Volkswagen to indemnify individual Class Members from personal injury

lawsuits brought against individual Class Members—and not Volkswagen—based

on the excess emissions from their vehicles. This is absurd. No such lawsuit has

been filed, and if it were, it would fail.

(4) **Class Counsel's fee motion.** During the intensive negotiation of this

Settlement, the parties did not discuss the amount of Class Counsel's prospective

fee request. They did, however, include a provision requiring Volkswagen to pay

Class Counsel's reasonable fees and expenses, if approved by the district court, *in

addition to* the $10.033 Funding Pool reserved exclusively for Class compensation.

Moreover, the district court directed Class Counsel to file a statement setting forth

the maximum amount they would seek in fees and costs, which they did, five

weeks before the objection and opt-out deadline and eleven weeks before final

approval. Class Counsel ultimately sought half the maximum fees set forth in that

statement, which amounted to less than 2% of the $10.033 billion Funding Pool.

All fee information was publicly posted on the various Settlement Websites. Class

Members had six weeks to object or respond. Several of them did, and the issues

related to that motion are the subject of separate appeals.

Separating fees from the merits is consistent with best practices and the governing case law, as set forth in both *In re Bluetooth*, 654 F.3d 935 and *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010).  Given that Volkswagen's obligation under the Settlement was to provide a fund at a specified amount available to every Class Member, regardless of any fee that ultimately ensued, the argument that this "segregated" fee structure took money away from the Class cannot be sustained.

But this is all shadow-boxing.  The real argument here—which Appellant Ancona makes directly—is that Volkswagen should have agreed to pay, subject to court approval, not just reasonable compensation for work done on behalf of the Class but also for individual attorneys' work for their individual clients.  There are some lawyers who rushed to sign up clients for contingency fees, and who are in the embarrassing position of having obtained nothing additional for them.  They would like Volkswagen to pay extra to these Class Members to cover their contingency claims.  But that is a matter of private contract between attorneys and clients, subject to state ethical boundaries on the justifiable grounds for a fee claim.  It is also the subject of separate appeals that have not yet been briefed here.

The fact that Appellant Ancona, or his lawyer, would have liked to be relieved of contractual obligations is no different from the claim that Class Members who have encumbered a part of their automobile would like to be

relieved of their debt obligations.  Everyone wants more.  But this is not an intra-class "conflict."  The Class was adequately informed that Volkswagen had agreed only to pay fees related to Common Benefit work.  The offer was uniform and did not create intra-class disparities.  If any particular appellant deemed this insufficient, the proper remedy was to opt out.

**(5) Alleged "illegality" of the Settlement.**  Appellant Fleshman is on a failing crusade to convince the DOJ and other State Attorneys General that under federal and state law, the Class vehicles cannot be legally operated.  None of those governments agree, and each has said as much over and over again.  Unsurprisingly, every court to review this argument has rejected it.  Those conclusions are consistent with the wording of the various statutes that Appellant Fleshman consistently misreads.

But, for the most part, this issue is not even relevant.  Fleshman wants the cars off the road.  That's exactly what the Settlement accomplishes, as less than five percent of the Class has chosen vehicle modification as opposed to a buyback.  But the modification option is important, too, as it not only gives consumers the option to keep their cars, if they can be fixed, but also gives Volkswagen the opportunity to fix the vehicles it buys back, thereby avoiding the significant environmental consequences of scrapping a half million cars.  There is no statutory

or regulatory obstacle to this aspect of the Settlement, as the district court correctly found.

(**6**) **Discovery request.**  Appellant Kangas sought discovery regarding the Settlement process, among other things.  He failed to set forth any facts indicating collusion that might merit such discovery under the applicable law.  He also failed to demonstrate that his requested discovery would aid the district court in its review of the Settlement, especially given the court's active oversight of the Settlement process.  The district court therefore properly denied this request for unnecessary discovery.

\* \* \*

The Settlement is a resounding success.  It resolves a significant portion of one of the largest consumer cases ever in a way that Class Members overwhelmingly support.  Literally hundreds of thousands of Class Members have already chosen to participate in it and have already sold their cars back or had them fixed by Volkswagen in exchange for generous compensation.  Appellants raise no arguments that would justify reversing this historic Settlement.

## STANDARD OF REVIEW

This Court reviews approval of a class action settlement for an abuse of discretion.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  Such decisions are "committed to the sound discretion of the trial judge because he

is 'exposed to the litigants, and their strategies, positions, and proof.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (internal citation omitted). Thus, appellate review of a class action settlement "is extremely limited." *Mego*, 213 F.3d at 458. This Court must "affirm if the district court judge applies the proper legal standard and his findings of fact are not clearly erroneous." *Id.* Challenges to the adequacy of notice, however, are reviewed *de novo*. *Lane v. Facebook, Inc.*, 696 F.3d 811, 834 (9th Cir. 2012).

## ARGUMENT

### I. Appellants Ancona, D'Angelo, Sodamin, Chechik, Siewert, and the Lujan Appellants Have Accepted Their Settlement Offers and Executed Binding Individual Releases—They Have No Standing to Appeal.

As discussed above, the vast majority of the approximately 490,000 Class Members have made claims, and most of them have already been paid. In contrast, only eleven appellants (counting a married couple as one appellant) have filed and pursued appeals of the Settlement approval. Remarkably, while those appellants' lawyers continue to argue the Settlement is unfair and inadequate, the appellants' own actions tell a different story. Indeed, although neither they nor their counsel have contacted Class Counsel on the matter, Class Counsel have now been informed by the Claims Supervisor that six—Ancona, D'Angelo, Sodamin, Chechik, Siewert and the Lujans—already accepted their Settlement offers. In so doing, each one executed an individual release that "fully, finally, irrevocably, and

forever release[d]" Volkswagen for all claims related to the "2.0-liter TDI matter . .

. even if the Final Approval Order is reversed and/or vacated on appeal." Kangas

E.R. 151-52 [Dist. Dkt. 1685-5 at 2]. These appellants therefore have no live

controversy and no standing to pursue their appeals. Once this information has

been fully verified and filed in the district court, Plaintiffs-Appellees will move to

dismiss their appeals. In an abundance of caution, Plaintiffs-Appellees

nevertheless address these appellants' substantive arguments, none of which have

merit.

## II.    The District Court Correctly Approved a Settlement Creating and Enforcing a $10.033 Billion Remedial Commitment.

### A.    There Is No Reversionary Component to the Settlement.

The Settlement ensures that all Class Members can claim their full

compensation without any reduction for Class Counsel's attorneys' fees and

without any reduction based on other Class Members' participation. Volkswagen

committed to paying 100% of every claim made, and, assuming every Class

Member participates and every Class Member chooses the option that pays the

most cash compensation, Volkswagen will pay $10.033 billion to Class Members.

The Settlement provides a Funding Pool mechanism to enforce this commitment,

and this funding process began shortly after the Settlement was signed. Kangas

E.R. 59, 85-86 [Dist. Dkt. 1685 at 11, 37-38]. The fact that a very small number of

Class Members may choose not to participate, and a very small number will select

the less expensive fix does not transform this into a "reversionary" settlement; it means simply that Volkswagen will not have to pay 100% of the maximum possible in order to pay 100% of the claims made.

Appellants Kangas and Chechik nevertheless claim error in the Settlement's "reversion" and boldly proclaim that the "reversion clause may revert billions back to Volkswagen." Kangas Appeal at 15; *see also* Chechik Appeal at 18-19. But the treachery of factual assertions is that they are subject to disproof. And appellants' contention that a significant portion of the $10.033 Funding Pool will go unpaid simply cannot be reconciled with the facts, both as they are now and as they already appeared at final approval. As reported above, less than one third of the Settlement period has now passed and approximately two thirds of the Class has completed their claims. P.A.E.R. 1114-26, 1140 [Dist. Dkts. 3370 at 4-16, 3370-1]. Volkswagen has already paid these Class Members $6.3 billion, with another $785 million committed to outstanding offers. P.A.E.R. 1114 [Dist. Dkt. 3370 at 4]. Notably, *more than 95%* of the owners who have completed their claims chose the Settlement's buyback option, the remedy that claims the maximum possible from the Funding Pool.

To reiterate, Volkswagen has already paid, or extended offers to pay, *more than $7 billion from the $10.033 billion funding pool*, with more committed daily. This is truly a remarkable success, especially given that the buyback compensation

is calculated using the "clean trade" *pre-emissions scandal* vehicle valuation, regardless of the vehicles' condition (so long as they are operable). This arguably incentivizes Class Members selecting the buyback to wait until the end of the claims period and drive their cars for "free" during the two-year period or to await the regulators' approval of emissions-reducing repairs. P.A.E.R. 1113 [Dist. Dkt. 3370 at 3]. Thus, the parties anticipate an additional spike in claims near the end of the claims period, ultimately pushing participation to historic heights for any class action settlement.

While these claims-paid statistics are impressive, they did not come as a great surprise. Thanks to an accessible pre-approval registration system, the district court and all the parties, appellants included, knew at the time of final approval that more than 311,000 Class Members had already registered for the Settlement—the vast majority preliminarily selecting the buyback—even though they had more than two more years in which to do so. Kangas E.R. 689 [Dist. Dkt. 1976 at 2]. Moreover, by that time, the Settlement Website had received 885,290 discrete visits, the Settlement Call Center had received over 105,000 calls, and Class Counsel had logged over 16,000 communications with Class Members. Kangas E.R. 689 and 791 [Dist. Dkts. 1976 at 2, 1976-2 at 2]. These communications confirmed the Class Members' immense and immediate interest

in the Settlement and their intention to claim its benefits—all facts well known to the district court. Kangas E.R. 26-27 [Dist. Dkt. 2102 at 26-27].

There could also be no doubt that Volkswagen would promote the Settlement's success, for a number of reasons. To begin, Volkswagen's reputation is on the line. The company knows that it lost the trust of its consumers, its regulators, and the public—and the record is replete with reminders that Volkswagen views this Settlement as an opportunity for redemption, a chance to make things right. *See, e.g.*, P.A.E.R. 77 [Dist. Dkt. 1439 at 7:19-23] ("Volkswagen is committed to winning back the trust of its customers, its dealers, its regulators, and all Americans. And we think that these agreements are an important step forward on the road to making things right.").

The Settlement's failure also would result in very serious fines. Under the related DOJ Partial Consent Decree—which was negotiated simultaneously with the Class Settlement—Volkswagen stipulated to pay an additional $98.5 million ($85 million to a federal trust, and $13.5 million to a California trust) for every 1% that the Settlement participation rate falls below an 85% target threshold nationwide and in California. Kangas E.R. 243 [Dist. Dkt. 1605-1 § 6.3]. As the district court found, these fines are steep and will "ensure Volkswagen will attempt to buy back or fix as many Eligible Vehicles as possible." Kangas E.R. 25 [Dist. Dkt. 2102 at 25].

Some appellants claim the threat of fines was illusory or insufficient to compel Volkswagen's compliance, Fleshman Appeal at 45-46; Kangas Appeal at 23-24, but that too is an empirical claim subject to verification. Volkswagen's actions show that it has worked hard to realize the Settlement's goals and hit the 85% threshold goals. P.A.E.R. 1115-20 [Dist. Dkt. 3370 at 5-10]. To administer the Settlement, Volkswagen "hire[d] and train[ed] hundreds of new employees," and "engage[d] numerous third party partners" to coordinate closely with hundreds of dealers, to quickly process hundreds of thousands of claims with more than two million documents, and to coordinate the buyback and modification of hundreds of thousands of cars across the country in less than eight months. *Id.* As a result of these efforts—and because of the significant benefits offered under the Settlement—Volkswagen is well on its way to reaching the 85% target, having bought back, fixed, or otherwise removed from commerce 61.6% of the affected vehicles. P.A.E.R. 1126 [Dist. Dkt. 3370 at 16].

Thus, the argument that Volkswagen has "strong financial incentive" not to hit the recall rate and "will do everything it can to . . . leave as many vehicles as possible on the roads" simply has no foundation in the record or in the real world of experience. *See* Fleshman Appeal at 45-46. The district court understood this. Kangas E.R. 35-36 [Dist. Dkt. 2102 at 35-36].

Similarly incorrect is Appellant Fleshman's assertion that the 85% recall rates are unenforceable. Fleshman Appeal at 45. The recall rates, and the fines imposed for missing them, are memorialized in the DOJ's Partial Consent Decree—a binding agreement that has been approved by the district court, with continuing jurisdiction to oversee its implementation. Kangas E.R. 172 [Dist. Dkt. 1605]. The district court is, in fact, actively overseeing implementation and holding all parties to its requirements and timelines, receiving regular reports and holding ongoing status conferences to ensure accountability.

No doubt there are cases involving aspirational agreements that have no bite. One of the few cases Fleshman musters in support of his argument, *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692 (9th Cir. 2004), is of that sort. In *Bayview*, this Court concluded that a transportation authority had simply agreed to a target ridership increase of 15% and, because it was known that this target depended on uncertain predictions, that agreement was not an enforceable promise. 366 F.3d at 698-99. Any first-year contracts course would caution against the enforceability of a promise resting on unknown third-party actions.

Here, in contrast, the DOJ Partial Consent Decree clearly establishes that "Settling Defendants ***are required*** to remove from commerce in the United States and/or perform an Approved Emissions Modification on at least 85% of the 2.0

Liter Subject Vehicles ("Recall Rate")." Kangas E.R. 176-177 [Dist. Dkt. 2103-1 at 3-4]. It also provides that if the "Settling Defendants do not achieve an 85% Recall Rate, Settling Defendants **must pay** additional funds into the Mitigation Trust." *Id.* This an unequivocal and binding obligation; nothing in *Bayview*, or any other case, suggests otherwise.[14] In basic contracts terms, this is an obligation, not an aspiration.

Appellant Kangas concedes, apparently in the alternative, that the related consumer and governmental Settlements do in fact "create[] a[n] . . . incentive for Volkswagen to undertake the recalls," but argues that, because of the "reversion clause," Volkswagen will encourage consumers to undertake those recalls through means other than the through Settlement program. Kangas Appeal at 16. Again, the evidence shows otherwise. The significant compensation available through the Settlement's buyback and modification programs—and not through any other means—has ensured that virtually all of the recalled vehicles have come in through the Settlement. Indeed, of the 296,011 vehicles that had been bought back by June 15, 2017, only 10,383 (3.5%) had been acquired through any avenue other than the Settlement. P.A.E.R. 1125-26 [Dist. Dkt. 3370 at 15-16].

---

[14] Appellant Chechik's related argument that Volkswagen will *defy the DOJ* and refuse to pay penalties, notwithstanding its clear obligation to do so if it misses the Recall Rate, lacks any foundation. Chechik Appeal at 20.

Under very different facts than those presented here, courts have expressed legitimate concerns that the defendants, class, and counsel might abandon a settlement after its approval, thus rendering its relief meaningless. For all the reasons described herein, those concerns are unfounded here. The district court understood this. *See, e.g.*, Kangas E.R. 26-27 [Dist. Dkt. 2102 at 26-27]. The appellants choose not to.

### B. There Is No Evidence of Collusion.

When in doubt, Appellants Kangas, Chechik, and Siewert toss around arguments about collusion as if they too needed no factual support. They do need support. There is none, however, as the district court concluded after engaging in the "heightened scrutiny" that this Court requires and that the appellants ignore. *See, e.g*, Siewert Appeal at 15-20.

The simple answer to appellants' unfounded claims of collusion is simply to point to the record. The district court's heightened scrutiny began at the earliest point in the litigation by his appointment of Settlement Master Mueller whom the court directed to oversee all settlement negotiations. P.A.E.R. 1-3 [Dist. Dkt. 973]. At the settlement approval stage, moreover, the court clearly and carefully applied all relevant standards to the facts of this case. Indeed, the court spent 27 pages thoroughly analyzing the *Churchill* factors, and then added two more pages of

analysis dedicated exclusively to the "*Bluetooth* Factors" that Appellant Siewert appears to have overlooked. Kangas E.R. 14-44 [Dist. Dkt. 2102 at 14-44].

After conducting this careful review, the district court made specific findings that there was no collusion. *See* Siewert E.R. 133-138 [Dist. Dkt. 1698 at 21-26] (finding no signs of collusion during preliminary approval); *see also* Kangas E.R. 43-44 [Dist. Dkt. 2102 at 43-44] (finding no evidence of collusion during final approval). The record is replete with facts supporting the district court's conclusion, including, for example, the remarkable benefits secured for the Class, Kangas E.R. 49 [Dist. Dkt. 1685], and the fact that the Settlement negotiations were negotiated at arm's-length, with the involvement of government parties and the supervision of both the Settlement Master and the district court. P.A.E.R. 244-46 [Dist. Dkt. 1977 at 2-4]. There is no evidence of collusion, and the district court's specific fact findings confirm this.

## III. The Settlement's Buyback Valuation is Considerably Above Market Value, and No One with Standing Has Challenged the Valuation.

The fact that so many Class Members have chosen the buyback—more than 96% of all owners who have completed claims—is a strong endorsement of its value and fairness. The Lujan Appellants argue, however, that the district court abused its discretion by approving a buyback formula that, according to them, did not include compensation specifically earmarked for, or attributable to, the after-market anti-theft products they purchased for their vehicle. This, the Lujans say,

will cause them to lose the value of these products if a fix is not approved for their vehicle and they are left with only the buyback remedy.  Lujan Appeal at 2-3.

The Lujans have no live claim before this Court.  As the Lujans themselves concede, "[i]t goes without saying that if the Lujans can have their car 'fixed,' they will continue to enjoy the benefits of their two anti-theft devices and they will not suffer any damages resulting from their having their purchased their anti-theft devices from their dealer."  Lujan Appeal at 2-3.  The regulators approved a fix for the Lujans' vehicle (a 2013 Passat) on May 12, 2017.[15]  The Lujans chose a buyback anyway, and in so doing, released all claims against Volkswagen, regardless of the outcome of these appeals.  Because the Settlement offered the Lujans complete relief, which they accepted with a release of their claims, they no longer have standing to appeal.  *See, e.g.*, *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) ("Article III denies federal courts the power to decide questions that cannot affect the rights of litigants in the case before them, and confines them to resolving real and substantial controversies admitting of specific relief through a decree of a conclusive character.") (internal citations and alteration omitted).

---

[15] The regulators' approval decisions and related information are posted to the Settlement Website (www.vwcourtsettelment.com).  The notification for the Lujans' vehicle is available at https://www.vwcourtsettlement.com/en/docs/emissions/Gen2_Automatic_Emissions_Modification_Disclosure_Volkswagen.pdf.

Even if this claim were live as to other Class Members who may have purchased dealer add-ons not expressly accounted for in the buyback formula, and for whose vehicles a fix has not yet become available (and who have not appealed the Settlement), the argument would fail. The Settlement's buyback and vehicle valuation formulas are based on the National Automobile Dealer Association ("NADA") pricing guidelines. *See, e.g.*, Kangas E.R. 52, 65 [Dist. Dkt. 1685 at ¶¶ 2.5, 4.2.1]. This industry standard accounts for a wide range of available vehicle options. It does not, however, include certain after-market add-ons like the Lujans' anti-theft devices, or special wheels, custom spoilers, and other specialization items.

There was good reason for this. This case is about what Volkswagen did to its cars before it sold them, not about what some owners chose to do afterward. Still, the Settlement goes well above the baseline of fairness, reasonableness and adequacy by providing a formula that is sufficiently generous to pay for those add-ons. But a process that required vehicle-by-vehicle inspection for a wide range of customizations would have resulted in an administrative nightmare. Kangas E.R. 754-56 [Dist. Dkt. 1976-1 at 24-26]. The district court was mindful of all of this, and found, based on his review of the voluminous record, that "[t]o offer compensation for aftermarket add-ons [would] complicate[] the claims process and

risk[] delaying Class Members' payments."  Kangas E.R. 33 [Dist. Dkt. 2102 at 33].  The district court did not abuse its discretion in so concluding.

Even setting aside administrative concerns, the Settlement restitution available to Class Members was specifically designed to ensure that the combined payments for all Class Members *exceeds* their vehicles' September 2015 NADA "clean retail" value, and thus indirectly accounts for additional dealer options, including the ones purchased by the Lujans.  This, too, supports the district court's factual findings and legal conclusion.

Equally unavailing is the claim that the customized options for their car make the Lujans a distinct subclass.  As the Third Circuit recently noted in rejecting claims for endless subclasses in the *NFL Concussion* litigation, what matters is that the representatives "seek recovery under the same legal theories for the same wrongful conduct" as the class or subclasses they claim to represent.  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016).  Here there is only one core claim—involving Volkswagen's deception in the fraudulent emissions process—and every Class Member is identically situated as to that claim.  The claim is the same regardless of what options Class Members purchased from their dealers or third parties.

Taken to its logical conclusion, the Lujans' position is that the Settlement can be approved only if it includes a Class Representative who purchased each

type of aftermarket add-on purchased by any Class Member.  This position has no support in class action law.  This Court has explained that "[u]nder [Rule 23's] permissive standards, representative claims are 'typical' if they are *reasonably* co-extensive with those of absent class members; *they need not be substantially identical*."  *Hanlon*, 150 F.3d at 1020 (emphasis added); *accord Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) ("The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'") (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

The cases the Lujans rely on do not hold otherwise.  In *Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010), for example, this Court analyzed whether a settlement involving nationwide surcharges precluded a party from bringing claims related to a state-specific surcharge that was not compensated in the settlement.  *Id.* at 591-92.  Because the nationwide settlement was represented by Kansas plaintiffs who could not be members of the objecting Washington class, the Court held that the Kansas representatives were not typical of the Washington plaintiffs, and therefore, could not release the Washington plaintiffs' claims.  *Id.* at 591-92.  Critically, the plaintiffs in *Hesse* were bringing separate legal claims that the class

representatives were unable to bring, and not merely seeking different compensation for slightly different individualized damages as the Lujans do here.

The Second Circuit's decision in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981), is similarly unavailing. There, the settlement was reversed because it released two ***types*** of claims yet compensated only one, noting that class members' claims for unliquidated contracts "were being placed on the block . . . in return [for nothing]." *Id.* at 16. The Second Circuit confirmed this reading of *Super Spuds* in *Joel A. v. Giuliani*, where it noted that that case involved "(1) a finite settlement fund . . . to be allocated among class members, and (2) claims of certain class members . . . were valued at zero in order to provide a higher payment to claims of other class members." 218 F.3d 132, 143 (2d Cir. 2000).

Here, in contrast, the Lujans' claims were not valued at zero, and they certainly were not "provided absolutely no benefit" in the Settlement, as was the case of the unliquidated contract holders in *Super Spuds*. In sum, the Lujans' interests—and those of all other Class Members—have been adequately represented. Their isolated (and now moot) desire for additional compensation does not compel a contrary finding.

**IV.** **The Settlement Provides a Fair Formula for Compensating Eligible Sellers, and the District Court Properly Exercised its Discretion by Approving It.**

Class Members who sold their vehicles between September 18, 2015, and June 27, 2016, are "Eligible Sellers" under the Settlement. They are entitled to half of the restitution amount that Eligible Owners receive: equal to 10% of the Vehicle Value, as defined in the Settlement, plus a restitution payment of $1,493, with a guaranteed minimum payment of $2,550. Kangas E.R. 57, 103-04 [Dist. Dkt. 1685 at ¶ 2.31, 1685-1 at 2-3]. Based on its review of the record, the district court determined that this fairly and adequately compensated Eligible Sellers. *Id.* Among other things, the court observed that if a Class Member had already sold his or her vehicle to a third party, he or she had already received some compensation for that vehicle. The Settlement nevertheless offers additional compensation to them on the theory that the post-September 18, 2015 sale price could have reflected a diminution in value caused by Volkswagen's disclosure. For most Eligible Sellers, the pre-Settlement sale plus the Settlement compensation met or exceeded the compensation those Class Members would have received had they kept their cars and participated in the Settlement's buyback program. For a few others, it did not.

But this fact does not, as Appellant Johnson contends, mean that "Eligible Sellers were unfairly treated and not adequately represented in the Settlement as

compared to other class members." Johnson Appeal at 7. Nor does it create a conflict among Class Members.[16] *Id.* Both conflict and inadequacy of representation are legal constructs that turn on conflicting loyalties that are not present here.

In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), for example, the conflict emerged not from the fact that there were different class members with different diseases, or that there were some class members with no present manifestation of disease, but from the incentives for unfaithful representation:

> [S]ome of the same lawyers representing plaintiffs and the class had also negotiated the separate settlement of 45,000 pending claims, . . . the full payment of which was contingent on a successful Global Settlement Agreement. . . . Class counsel thus had great incentive to reach any agreement in the global settlement negotiations that they thought might survive, . . . rather than the best possible arrangement for the substantially unidentified global settlement class.

*Ortiz*, 527 U.S. at 852 (internal citations omitted).

This Settlement, in contrast, treats Eligible Owners differently from Eligible Sellers by necessity, since the former still owned the vehicles that were emitting illegal levels of pollutants and that needed to be fixed or taken off the road, while the latter did not. Under *Ortiz,* this is not a conflict. Treating differently situated individuals differently is perfectly compatible with class representation, so long as

---

[16] Although Johnson questioned the adequacy of representation in his objection filed with the district court, he did not assert a "conflict" as he does on appeal. *See* Johnson E.R. 217 [Dist. Dkt. 2049-4]; Johnson E.R. 1 [Dist. Dkt. 2248].

there are no incentives to treat one group unfairly to benefit another. No more is required under the law. *See Hanlon*, 150 F.3d at 1027 (In evaluating a settlement, the "question [this Court must] address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). The Eligible Seller compensation is fair under the circumstances, and roughly 10,000 of them have already completed their claims. P.A.E.R. 1114 [Dist. Dkt. 3370 at 4].

## V.  The Scope of the Release is Appropriate, and the District Court Properly Exercised its Discretion by Approving It.

The scope of the class-wide release in the Settlement is appropriate and unremarkable. As the district court noted in overruling Appellant Kangas' objection, '[c]lass action settlement agreements commonly release concealed or hidden claims." Kangas E.R. 40 [Dist. Dkt. 2102 at 40] (citing examples). Other courts within the Ninth Circuit agree. *See, e.g.*, *Four in One Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-CV-3017 KJM EFB, 2014 WL 4078232, at *3, *15-16 (E.D. Cal. Aug. 14, 2014); *Taylor v. W. Marine Prods., Inc.*, No. C 13-04916 WHA, 2015 WL 307236, at *2 (N.D. Cal. Jan. 20, 2015); *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420-YGR (DMR), 2017 U.S. Dist. LEXIS 45696, at *83 (N.D. Cal. Mar. 20, 2017); *Milano v. Interstate Battery Sys. of Am.*, No. 10-CV-2125-CW, 2012 U.S. Dist. LEXIS 93201, at *20 (N.D. Cal. July 5, 2012); *Barboso v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 438 (E.D. Cal. 2013). A

recent Third Circuit decision is also in accord.  *Halley v. Honeywell Int'l, Inc.*, No. 16-2712, 2017 WL 2802638, at *9 (3d Cir. June 29, 2017) (the district court did not "abuse[] its discretion in approving [a] settlement . . . [that] release[d] 'unknown' and 'unforeseen' claims").

The reason for this is simple: without broad releases, defendants cannot achieve finality.  *See, e.g.*, *id.* (Broad releases "serve[] the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action.").  Without finality, defendants have little incentive to settle.

Kangas does not refute these points or otherwise address the many decisions from district courts in this Circuit that support the district court's conclusion.  He relies instead on a single opinion from the Delaware Chancery Court, *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 348 (Del. Ch. 2006), but even this case holds only that settlements should release only "claims that are based  . . . on the 'same set of operative facts as the underlying action.'"  898 A.2d at 347 (internal citation omitted).  That is what the release does here.  It releases only those claims related to "the 2.0-liter TDI Matter."  Kangas E.R. 80 [Dist. Dkt. 1685 at 32].  The "2.0-liter TDI Matter," in turn, is comprehensively defined, but, in essence, is limited to the "installation or presence of any Defeat Device" in the Class vehicles, the false marketing of the Class vehicles, and the "actual or alleged non-compliance" of the

Class vehicles "with state or federal emissions standards."  Kangas E.R. 51-52 [Dist. Dkt. 1685 at 3-4].  These are precisely the "operative facts" upon which the "underlying action" was based.  And, although the *UniSuper* court went on to strike the release of claims "hidden or concealed," it did so only to the extent that clause implicated facts affirmatively concealed from plaintiffs that did not relate to the operative facts of the underlying action.

In a related argument, Kangas labels the Settlement an "illegal contract" that is "against public policy, an affront to our court system, and [that] cannot be enforced by any court."  Kangas Appeal at 22.  Kangas identifies no legal support for this assertion, and fails to muster even a single instance where a similar release akin to that in the Settlement has been deemed illegal.  No such authority exists.

Kangas failed to demonstrate that the district court abused its discretion by approving the terms of the release under the facts of this case.

## VI.    The District Court Properly Rejected the Claim That Volkswagen Must Indemnify Class Members Against Frivolous Litigation.

Appellant Kangas argues the Settlement must be overturned because it does not require Volkswagen to indemnify Class Members for third party personal injury claims related to $NO_X$ emissions.  Kangas Appeal at 18-19.  This is argument for the sake of argument, and it cannot succeed.  There is no realistic possibility that a third party could successfully sustain a personal injury suit against any individual Class Member based on the excess emissions that an

individual's vehicle emits or emitted before or during the pendency of the Settlement Period.

Indemnity protects tortfeasors. Class Members were the unknowing victims of Volkswagen's emissions cheating scheme. In this morality play, the Class wears the white hat, and does not require indemnity. Unsurprisingly, then, although almost two years have passed since the defeat device allegations were made public, and more than a year has passed since the Settlement was filed, Appellees are not aware of even one emissions-based lawsuit filed against any of the approximately 490,000 Class Members. Kangas could have opted out if he truly believed it important to preserve an indemnity claim against Volkswagen. He did not. And neither did the rest of the more than 99% of the Class, who implicitly rejected Kangas' absurd argument and chose the constructive approach to solving the excess emissions problem by participating in the Settlement.

## VII. The District Court Did Not Err by Setting Different Schedules for the Briefing of, and Objections to, the Final Approval of the Settlement and Class Counsel's Fee Application.

Although the issue of attorneys' fees is proceeding on a separate appellate track, some appellants claim error in the district court having approved the Settlement before Settlement Class Counsel submitted their fee application. *See* Weese and Sodamin Appeal at 8-10; Kangas Appeal at 33-34; Chechik Appeal 9-18; D'Angelo Appeal at 15-25; Siewert Appeal at 9-10.

Rule 23(h) does not require class counsel to move for fees prior to final approval of a settlement. *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 445 (3d Cir. 2016) ("[T]he separation of a fee award from final approval of the settlement does not violate Rule 23(h)."); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 918 n.16 (E.D. La. 2012) (approving settlement where "parties had no discussions regarding fees other than the PSC's making clear that it would eventually file a request for attorneys' fees").

Neither *In re Bluetooth*, 654 F.3d 935, nor *In re Mercury*, 618 F.3d 988, instructs otherwise. Indeed, in *Bluetooth* this Court *rejected* a categorical ban on separating settlements and fee awards. *Id.* at 949. Instead, the Court explained simply that "assessment of the settlement's overall reasonableness must take into account the defendant's overall willingness to pay," *id.*, an assessment the district court plainly conducted here. In the order granting preliminary approval, the district court ordered Class Counsel to "submit more information regarding the PSC's prospective request for attorneys' fees" five weeks before the initial objection deadline. Kangas E.R. 2121 [Dist. Dkt. 1688 at 32]. Class Counsel filed that statement on August 10, 2016—approximately five weeks before the opt-out deadline and eleven weeks before final approval. Lujan E.R. 1117 [Dist. Dkt. 1730].

That Statement, available on the district court's website and on the

Settlement Website (which featured prominently in all notice materials, *see* Kangas

E.R. 109-140 [Dist. Dkts. 1685-2, 1685-3]), coupled with the notice material

disseminated to the Class and the Settlement itself, informed the district court and

the Class: (1) that Volkswagen would pay Class Counsel's fees, if approved by the

district court, *in addition to* the compensation made available to the Class; (2) that

Class Counsel would seek a maximum of $324 million in attorneys' fees and $8.5

million in costs; and (3) that Class Counsel's motion would "utilize the percentage

methodology approved by the Ninth Circuit for class action settlement fee awards,

albeit at an amount far below the 25% benchmark established by the Ninth

Circuit."  Lujan E.R. 1117 [Dist. Dkt. 1730].[17]  Class Members therefore had

sufficient information to inform their opt-out/objection decisions, and the Court's

instructions set forth in *Bluetooth* and Rule 23(h) were satisfied.

The Third Circuit agrees.  *In re NFL Concussion,* 821 F.3d at 446.  In *NFL*

*Concussion*, the court concluded, that where class members are informed "that the

[defendant] would pay attorneys' fees from a separate fund and not object to an

award up to [a certain amount] and that the District Court would consider fees after

final approval and afford [class members] an opportunity to object," those class

---

[17] Ultimately, Class Counsel sought a combined award of $175 million in fees and costs, little more than half the maximum set forth in their fee statement. P.A.E.R. 333 [Dist. Dkt. 2175].

members "had enough information to make an informed decision about whether to object to or opt out from the settlement." *Id.* This is precisely the information that was available to Class Members here. And, here, as in *NFL Concussion*, this information satisfied Rule 23(h) even if "class members were missing certain information—for example, the number of hours class counsel worked and the terms of any contingency fee arrangements class counsel have with [class members]." *Id.*

Furthermore, when Class Counsel did file their fee motion, Class Members had plenty of time to review it and object to it. This is all that is required by *In re Mercury,* 618 F.3d 988, in which the Court concluded simply that class members must be permitted to object to a fee motion "*after* the motion and documents supporting it have been filed." *Id.* at 993-95. That is exactly what happened here.

Notice of this motion was adequate, notwithstanding appellants' objections. Rule 23(h)(1) requires that notice of a fee motion be "directed to class members *in a reasonable manner*." Fed. R. Civ. P. 23(h)(1) (emphasis added). Here, Class Members were notified that they would have "an opportunity to comment on and/or object to" Class Counsel's fee request "at an appropriate time" and were advised that it "was a good idea to check" the Settlement Website for updates. Kangas E.R. 138-39 [Dist. Dkt. 1685-3 at 27-28]. Then, in the district court's order granting final approval, the court ordered Class Counsel to file their fee

motion by November 8, 2016, and set a response and objection deadline for *six weeks after that*. Kangas E.R. 48 [Dist. Dkt. 2102 at 48]. That order was posted promptly on both the Settlement Website and the district court's website. When Class Counsel filed their motion, it too was promptly posted on both the Settlement Website—which Class Members had been advised to check, and which has received millions of visits—and the district court's website. Together, this satisfies Rule 23(h)(1)'s "reasonable notice" standard, as evidenced by the fact that several Class Members did in fact object to Class Counsel's fee request after it was filed. *See* P.A.E.R. 395-439 [Dist. Dkts. 2479, 2518, 2534, 2537, 2538].

This conclusion is undisturbed by *Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015), which is consistent with *NFL Concussion* and simply confirms the *Mercury* court's holding that class members must be afforded an opportunity to object to a fee motion after it is filed. In *Allen*, the Ninth Circuit reversed and remanded a district court's approval of a settlement and the requested attorneys' fees, where (1) before the opt-out and objection deadline, class counsel had not informed the court or the class as to the maximum amount of fees that they would actually seek, (2) class counsel's fees would be deducted from, and not added to, the compensation for the class, and (3) the district court had ordered that "all objections . . . were due" before the Class received information about Class Counsel's fee request. *Id.* at 1225. *Allen v. Bedolla* highlights all the things this case is not. Here, Class

Counsel filed their statement on attorneys' fees before the initial objection/opt-out deadline, and when they filed their motion, Class Members had reasonable notice and six weeks to object.

In sum, Class Members were sufficiently informed about Class Counsel's fees before the opt out and initial objection deadline, and were adequately notified of, and given sufficient opportunity to object to, Class Counsel's full fee motion. The requirements set forth in Rule 23(h), *Bluetooth*, *Mercury*, and *Allen*, were satisfied.

## VIII. The Court Did Not Abuse its Discretion in Concluding the "Segregated" Fee Structure Did Not Harm the Class.

In the district court, one objector claimed, without benefit of evidence, that the prospect of a fee award must have caused a reduction in the compensation due to the Class. That objector did not appeal, but Appellant Kangas—never one to let facts stand in the way of free range arguments—took up the torch, claiming that the fee liability "cost the class hundreds of millions in compensation." Kangas Appeal at 33. According to Kangas, because Volkswagen did not know how much it would eventually have to pay in attorneys' fees, it withheld funds—arguably, more than the $175 million it ultimately paid—that would otherwise have been made available to the Class. At bottom, this argument would have an appellate court reverse any settlement in which attorneys were paid for their efforts, as this could potentially reduce class compensation. If this is the argument, it finds no

support in the law, for courts recognize that without compensation to counsel there would be no class actions. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (recognizing need to make prosecuting a case "'worth someone's (usually an attorney's) labor'") (citation omitted).

And if Kangas is complaining about a reduction of value in *this case*, the record offers him no support. At the time the Settlement was reached, Volkswagen's total exposure for the defeat device, from settlements, fines, penalties, emissions notification costs, returned vehicle storage, repair, or destruction costs, etc., was unknown, and it remains unknown today. What is clear is that Volkswagen's total liability dwarfs any potentially reasonable fee request by an order of magnitude. In addition to the approximately $15 billion secured through the Settlement and related government Settlements, at the time the 2.0-liter Settlement was reached, Volkswagen still had to negotiate further settlements with the franchise dealers (which ultimately settled for more than $1.2 billion), negotiate civil and criminal fines and penalties in the United States ($4.3 billion more), address the 3.0-liter claims in the United States ($1.2 to $4.04 billion more), and resolve private and public claims for the remaining 10.5 million vehicles worldwide (unknown), among other potential liabilities. The notion that Volkswagen was somehow able to calculate, in advance, a single maximum amount that it would pay to resolve all of these claims and meet all these expenses

(necessarily more than the $20 billion already expended), and that it then withheld a few hundred million dollars from the Settlement's Funding Pool (a miniscule percentage of the total exposure) so as not to exceed that total value, is nonsensical. The record on this issue is clear, as Volkswagen clearly stated in the district court. P.A.E.R. 647-48 [Dist. Dkt. 2786-4] ("Volkswagen did not reserve, hold back, or in any other way deduct money or value from the compensation offered to the Class under the Consumer Class Action Settlement Agreement and Release to account for attorneys' fees for Class Counsel.").

By focusing on Class compensation first and attorneys' fees second, Class Counsel did not harm the Class; they helped the Class. The district court did not abuse its discretion in so concluding.

## IX. Volkswagen's Agreement to Pay Class Counsel's Reasonable Attorneys' Fees and Costs Did Not Create an Intra-Class Conflict.

Appellant Ancona contends that, because Volkswagen agreed to pay reasonable attorneys' fees for Class Counsel (if approved by the district court), "the interests of lead plaintiffs and their counsel conflicted with the interests of thousands of class members who had hired individual lawyers who claimed liens on the recovery." Ancona Appeal at 1. This suggestion of an "intra-class" conflict was not presented before the district court and is thereby waived.[18]

---

[18] The only mention of the word "conflict" in Ancona's objection was in passing when asserting: "Class Members who have counsel and agree to the settlement will

It is also ridiculous on the facts, as the district court ruled that no attorney liens on Settlement proceeds may be enforced. Lujan E.R. 199 [Dist. Dkt. 2247]. Even Ancona concedes that when the district court appointed Class Counsel, it "effectively discharge[ed]" non-Class Counsel from representing their individual clients. Furthermore, in the district court's order denying non-class counsel's fee motions, the court required any attorney attempting to "enforce a fee agreement to first provide his or her client with a copy of [the district court's order], and to file a certificate of service with [the district court]." P.A.E.R. 1053-54 [Dist. Dkt. 3178 at 8-9]. Plaintiffs-Appellees are aware of only one such filing.

Even accepting Ancona's claimed representation, there is no conflict in representation. Many Class Members, including the majority of Class Representatives, entered into attorney engagement agreements that, in theory, entitled those attorneys to a percentage of their clients' recoveries. Thus, the Class Representatives are not differently situated than Ancona, or any other Class Member who was represented by counsel. No conflict exists. Whether some attorneys seek to enforce their individual representation agreements is a matter of

incur such a lien, putting them at a distinct disadvantage—and *perhaps* even conflict—with other, non-represented Class Members." Ancona E.R. 295 [Dist. Dkt. 1905-1 at 9] (emphasis added). This Court "appl[ies] a 'general rule' against entertaining arguments on appeal that were not presented or developed before the district court." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998).

individual contract, governed by local rules of professional conduct. This does not establish an intra-class conflict or otherwise compel the Court to disturb the Settlement.

What Ancona seems to misunderstand is that the attorneys' fees that Volkswagen agreed to pay through the Settlement were not fees for work that Class Counsel performed on behalf of their individual clients, but rather fees for the Common Benefit work that Class Counsel performed on behalf of *the entire Class*, as set forth in the district court's pretrial orders appointing the PSC and setting forth the requirements for Common Benefit Work. Lujan E.R. 281 [Dist. Dkt. 1084]; P.A.E.R. 4-15 [Dist. Dkt. 1254].[19]

Contrary to Ancona's contention, the notice materials did not "mislead" Class Members by communicating that Volkswagen would pay fees for attorneys who did not perform common benefit work. Ancona Appeal at 22. As Ancona concedes, the Long Form Notice explained that Class Counsel represented all Class Members, and that their services would be provided "without charge" to the Class. *Id.* at 23. It further explained that "Class Counsel will represent you at no charge to you, and any fees Class Counsel are paid will not affect your

---

[19] Appellant D'Angelo raised a similar objection before the district court. On appeal, he has abandoned this claim and "is satisfied, now, that the district Court to some degree ameliorated its error by (1) providing a mechanism through which all counsel can apply for their fees and (2) has precluded the enforcement of any attorney liens by the same order." D'Angelo Appeal at 18.

compensation." *Id.* It also cautioned Class Members that "if you want to be represented by your own lawyer, you may hire one at your own expense." *Id.* The statement that "class members will receive 100% of the compensation described in this Notice, and . . . their compensation will not be reduced by attorneys' fees and costs" was neither incorrect nor misleading.

X. **Appellant Fleshman's Argument That the Settlement Violates the Clean Air Act and Virginia State Implementation Plan Is Wrong and Does Not Require Reversal of the Settlement.**

Appellant Fleshman noticed appeals from both the order approving the Settlement (No. 16-17183) and the order denying his motion to intervene in the consumer action (No. 16-16731). Yet, in the single opening brief he filed, Fleshman does not dedicate a single word or argument to the denied motion for intervention. Those arguments are therefore waived, and Fleshman's consumer intervention appeal should be rejected in its entirety. *See Armentero v. INS*, 412 F.3d 1088, 1095 (9th Cir. 2005).

Fleshman's remaining appeal turns on the claim that the Class vehicles are illegal to drive under the Clean Air Act ("CAA") and/or Virginia's State Implementation Plan ("SIP"). That premise is incorrect. Fleshman has raised this argument on at least four separate occasions—three times to the district court, and once in a related action he filed in Virginia state court. In each instance, the argument was rejected. *See* Fleshman E.R. 61 [Dist. Dkt. 1742] (denying motion

to intervene in consumer action), Fleshman E.R. 55-56 and 58 [Dist. Dkt. 1991 at

7-8, 10] (denying motion to intervene in government action and motion to depose

Virginia class representatives), Kangas E.R. 40 [Dist. Dkt. 2102 at 40] (overruling

objection to Settlement), and Fleshman E.R. 1043 [Dist. Dkt. 1812-1 at 19] (Letter

Opinion, *In re Volkswagen "Clean Diesel" Litig.*, No. CL-2016-9917 (Fairfax

Cnty. & City Cir. Ct. Aug. 30, 2016) (denying motion for temporary injunction)).

There is simply no authority to support Fleshman's argument that state or

federal authorities would condemn the Class vehicles as illegal to drive. The EPA

has stated unequivocally that, despite Fleshman's protests, the vehicles remain

"legal to drive" in Virginia and elsewhere in the United States[20] and that it "will

not confiscate your vehicle or require you to stop driving."[21] The 44 states

participating in the Attorneys General settlement have also agreed to allow Class

vehicles to stay on the road pending participation in the Settlement. This includes

the Virginia Attorney General, who has acknowledged that the Virginia state

---

[20] U.S. Envtl. Protection Agency, EPA, California Notify Volkswagen of
Additional Clean Air Act Violations (Nov. 2, 2015), *available at*
https://www.epa.gov/newsreleases/epa-california-notify-volkswagen-additional-
clean-air-act-violations.

[21] U.S. Envtl. Protection Agency, Frequent Questions about Volkswagen
Violations, https://www.epa.gov/vw/frequent-questions-about-volkswagen-
violations (last visited Aug. 29, 2016).

government has settled its claims on behalf of Virginia citizens as part of the

"extraordinary" omnibus settlement with Volkswagen.[22]

Unsurprisingly, then, Chief Judge White of the Fairfax County Circuit Court

recently opined that "[n]either the EPA nor Virginia has declared the vehicles to

not be road worthy or otherwise illegal," and concluded that Fleshman's argument

that the Class vehicles were illegal to drive was pure "speculation." *In re*

*Volkswagen "Clean Diesel" Litig.*, CL-2016-9917, Opinion Letter, *see* Fleshman

E.R. 1043 [Dist. Dkt. 1812-1 at 19]; *see also* Kangas E.R. 1 [Dist. Dkt. 2102]

(holding that "[n]o federal or state authority has declared the Eligible Vehicles

illegal to drive).

Virginia's SIP does not make it "illegal [for consumers] to operate" the

Class vehicles, and neither do any other state SIPs.  Fleshman Appeal at 19.

Virginia's SIP prevents only *post-sale* tampering with a vehicle's emissions

system, and cannot be read to affect consumers driving vehicles in which the

manufacturer installed defeat devices before the vehicles were sold to consumers.

Contrary to Fleshman's assertion, Section 209(a) of the CAA prohibits states from

---

[22] Press Release, Commonwealth of Virginia Office of the Attorney General, *Herring Announces Compensation for Virginia Consumers Under Settlements with Volkswagen Over Emissions Fraud* (June 28, 2016), *available at* http://ag.virginia.gov/media-center/news-releases/773-june-28-2016-herring-announces-compensation-for-virginia-consumers-under-settlements-with-volkswagen-over-emissions-fraud.

enforcing standards relating to "emissions from *new* motor vehicles or *new* motor vehicle engines." 42 U.S.C. § 7543(a) (emphasis added). Supreme Court precedent confirms this interpretation. *Exxon Mobil Corp. v. U.S. Environmental Protection Agency*, 217 F.3d 1246, 1254, 1255 (9th Cir. 2000) (The CAA "protects the authority of the states to regulate air pollution" in a number of ways, but "with the exception of … standards for new motor vehicles."). Thus, no state SIP, including Virginia's, can be construed to prohibit use of a vehicle because of *pre-sale* emissions tampering. These are precisely the facts here. The Settlement is therefore consistent with federal and state clean air policy, and furthers the purposes of the CAA.

In sum, Class Members may lawfully operate their Class vehicles during the Class period. This fact undermines each of Fleshman's remaining arguments, including his claim that the notice was misleading for failing to warn Class Members that the Class vehicles cannot be legally operated (because they can be).[23] Fleshman Appeal at 38.

Finally, even if Fleshman were correct that Virginia law made it illegal to operate the Class vehicles, "the Settlement in fact addresses this concern" because

---

[23] Notably, out of an abundance of caution, the notice does state that Class Members who elect to opt out of the Settlement, or who allow the deadline to pass without participating in the Settlement, *may* one day face consequences under the CAA or the various State Implementation Plans. *See* Kangas E.R.133 [Dist. Dkt. 1685-3 at 22].

"[b]y requiring Volkswagen to buyback or fix the vehicles, the Settlement ensures that Eligible Vehicles will be taken off the road or brought into compliance." Fleshman E.R. 58 [Dist. Dkt. 1991 at 10]. This is precisely what Fleshman claims should take place in order to remedy the violations at issue. Fleshman Appeal at 41.

## XI. The District Court Adequately Reviewed and Properly Overruled Appellant Weese's Objection Regarding Existing "Liens."

Appellant Weese contends the district court abused its discretion in approving the Settlement because she had "complained about the term 'lien' in the Notice," but the district court did not specifically mention her complaint in its order granting final approval. Weese Appeal at 8. She may feel overlooked, but this objection makes no sense. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) (rejecting objector's argument that reversal was warranted because "district court did not give an express, detailed response to the objections").

Weese's objection was based on the mistaken belief that "the Claims Process denies recovery to Owner-Claimants with any 'lien' and creates de facto Class Member eligibility criteria that are not part of the Class Definition." Weese E.R. 41 [Dist. Dkt. 1864 at 5]. The Settlement requires that Class Members deliver clean title and a release to Volkswagen in exchange for a buyback payment—and a lien temporarily prevents the delivery of clean title. The Settlement cannot

abrogate the rights of those who are not parties to the Settlement (such as

lienholders), and thus cannot eliminate the lien for any individual Class Member.

Once a Class Member has removed the lien from his or her vehicle, he or she is

eligible for either the buyback or the fix. This lien removal occurs as part of the

buyback process. The Settlement provides for lenders to be paid off, and actually

provides *additional* compensation for those whose debts exceed the value of the

buyback compensation. As the Long Form Class Notice explains:

> **23.** **Can I participate in the Buyback option if I have an outstanding loan on my vehicle?**
>
> Yes. Your payment will be based on the amount of your outstanding loan as follows:
>
> • If your outstanding loan balance is less than the Vehicle Value plus Owner Restitution, Volkswagen will pay off your loan and pay you the difference.
>
> • If your outstanding loan balance is between 100% and 130% of the Vehicle Value plus Owner Restitution, Volkswagen will pay off your loan in full.
>
> • If your outstanding loan is more than 130% of the Vehicle Value plus Owner Restitution, your loan will be paid off up to 130% of the Vehicle Value plus Owner Restitution (see Question 19). You must pay any remaining loan balance necessary to transfer ownership of the vehicle to Volkswagen to complete the Buyback transaction.

Kangas E.R. 127-28 [Dist. Dkt. 1685-3 at 16-17]. A substantial portion of the

Settlement infrastructure is devoted to contacting, accounting for, and paying off

lienholders, including hundreds of different financial institutions, and many Class

Members with liens on their cars have successfully completed the buyback process and have been paid.  *See, e.g.*, P.A.E.R. 986-90 [Dist. Dkt. 2979 at 9-13].  This argument is misguided and provides no reason to reverse the Settlement.

## XII. Appellant Kangas Did Not Demonstrate He Was Entitled to Discovery, and the District Court Properly Denied His Request.

Three days after the district court preliminarily approved the Settlement, Appellant Kangas sought to intervene in the proceeding so that he could conduct "limited discovery" "into the process through which the settlement . . . was negotiated and the strength of the defenses to the core allegations."  Kangas E.R. 2077 [Dist. Dkt. 1710 at 2].  The district court denied Kangas' motion, finding that he "d[id] not meet the requirements for intervention of right and fail[ed] to show any suggestion of collusion to allow him to permissively intervene to conduct discovery."  Kangas E.R. 2046 [Dist. Dkt. 1746 at 1].  Kangas now argues that the denial of his request for discovery was error.  It was not.

The district court correctly observed that "objectors do not have an absolute right to discovery."  Kangas E.R. 2049-50 [Dist. Dkt. 1746 at 4-5] (quoting *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 316 (3d Cir. 2005)); *see also Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 619 (S.D. Cal. 2005).  Even the cases on which Kangas relied in support of his request recognized as much.[24]  The

---

[24] *See Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 132 (2008) (holding that a "trial court need not grant all requests that the objector sees fit to

district court also properly recognized that "[c]ourts are particularly reluctant to allow discovery as to settlement negotiations." Kangas E.R. 2050 [Dist. Dkt. 1746 at 5] (citations omitted). Accordingly, "discovery of settlement negotiations is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive." Kangas E.R. 2050 [Dist. Dkt. 1746 at 5] (citations omitted).

As the district court noted, "Kangas' only purported evidence of collusion [was] the fact that Class Counsel reviewed documents written in German." Kangas E.R. 2050 [Dist. Dkt. 1746 at 5]. "By producing documents in German," Kangas argued, "Volkswagen is attempting to [keep] class members in the United States in the dark." *Id*. In essence, Kangas argues that Germans speaking German is a sure sign of conspiracy. This argument is frivolous, to say the least.[25] Volkswagen AG,

---

make," and requests for discovery related to a mediation process "should be denied"); *Charron v. Wiener*, 731 F.3d 241, 248 (2d Cir. 2013) (confirming that objectors must "raise 'cogent factual objections to the settlement'" and show that "prior discovery was insufficient or nonadversarial" to obtain discovery) (internal citations omitted); *Casey v. Citibank, N.A.*, No. 1:13-CV-353, 2014 WL 4120599, at *1 (N.D.N.Y. Aug. 21, 2014) (reiterating that under *Charron* "limited discovery" is permitted, "but only if there is some evidence that the settlement may be collusive or does not adequately reflect the interests of the class members"); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (allowing discovery only where settlement was approved "based upon the inadequate record before [the court]"); *In re Cmty. Bank*, 418 F.3d at 316 (holding "*Girsh* cannot stand for the proposition that, as a general matter, objectors have an absolute right to discovery").

[25] Notably, Kangas' counsel, Frederic Fletcher, has made similarly unfounded claims of collusion before, when attacking a different class action settlement as a

Audi AG—and their alleged co-conspirator, Bosch GmbH—are all German corporations headquartered in Germany.  Of course there were relevant documents written in German.  Faced with this nonsense, the district court actually had to waste time to find that a company producing business documents in the manner in which they were created—and Class Counsel's review of those documents—did not evince collusion, but rather demonstrated that Class counsel had fulfilled its obligations to engage in "fully informed settlement negotiations."[26]  Kangas E.R. 2051 [Dist. Dkt. 1746 at 6]; *see also* Siewert E.R. 134 [Dist. Dkt. 1698 at 22] (Class counsel's review of discovery "allowed them to make a well-informed assessment of the merits of the Class' claims and to determine whether Volkswagen's offers adequately compensates Class Members for their injuries"); Kangas E.R. 21-22 [Dist. Dkt. 2102 at 21-22] (same).

The district court therefore did not err in concluding Kangas had failed "to point to anything that even remotely suggests collusion."  Kangas E.R. 2051 [Dist. Dkt. 1746 at 6].  As the district court held in this context, and on many other

---

*pro se* objector.  *See In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 11 (D.D.C. 2013) ("While objector Fletcher alleges, without support, that '[t]he Settlement favors LivingSocial to such an unprecedented degree that collusion must have occurred', his assumption is based on a flawed understanding of the settlement agreement and the release.").

[26] The fact that a number of PSC members and other lawyers engaged in discovery in this case are fluent in German materially furthered the diligent review of the record.

occasions, there was no such collusion. *See* Siewert E.R. 133-138 [Dist. Dkt. 1698 at 21-26] (no evidence of collusion during preliminary approval); *see also* Kangas E.R. 43-44 [Dist. Dkt. 2102 at 43-44] (no evidence of collusion during final approval).

This conclusion finds even more support in the fact that the Settlement negotiations were conducted at arm's-length between multiple parties, including government agencies charged with protecting consumers, under the close supervision of an extraordinarily qualified Settlement Master (who was later obligated to withdraw from further participation because of appointment to a position of high national importance[27]).  As in *Gallucci v. Gonzales*, the district court here "searched for signs of collusion" and "correctly found none," a conclusion which was "bolstered by the fact that the Settlement was negotiated with the aid of a[n] . . . experienced mediator, who reported no evidence of collusion."  603 F. App'x 533, 534 (9th Cir. 2015) (citing *Bluetooth*, 654 F.3d at 947)); *see also Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 360 (E.D.N.Y. 1982), *aff'd*, 721 F.2d 881 (2d Cir. 1983) ("That a government agency participated in successful compromise negotiations and endorsed their results is a

---

[27] *See, e.g.*, Rebecca R. Ruiz and Mark Landler, *Robert Mueller, Former F.B.I. Director, Is Named Special Counsel for Russia Investigation*, The New York Times (May 17, 2017), available at https://www.nytimes.com/2017/05/17/us/politics/robert-mueller-special-counsel-russia-investigation.html.

factor weighing heavily in favor of settlement approval—at least where, as here, the agency is 'committed to the protection of the public interest.'").  There is no evidence of collusion.

## CONCLUSION

The district court's approval of the Settlement was well within its discretion under Rule 23(e).  That approval, and the district court's denial of Appellant Kangas' motion for discovery, should be affirmed.


Dated:   July 5, 2017

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
David S. Stellings
Kevin R. Budner
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: 415.956.1000
Facsimile:  415.956.1008
E-mail: *ecabraser@lchb.com*

*Plaintiffs-Appellees' Lead Counsel*

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345.6555
Facsimile:  304.342.1110
E-mail: bbailey@baileyglasser.com

Roland K. Tellis
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA  91436
Telephone: 818.839.2320
Facsimile:  818.986.9698
E-mail: trellis@baronbudd.com

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL  36104
Telephone: 800.898.2034
Facsimile:  334.954.7555
E-mail:
dee.miles@beasleyallen.com

David Boies
BOIES,  SCHILLER  &  FLEXNER
LLP
333 Main Street
Armonk, NY  10504
Telephone: 914.749.8200
Facsimile:  914.749.8300
E-mail: dboies@bsfllp.com

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
Telephone: 973.994.1700
Facsimile:  973.994.1744
E-mail: jcecchi@carellabyrne.com

Frank Mario Pitre
COTCHETT PITRE &
McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: 650.697.6000
Facsimile:  650.697.0577
E-mail: fpitre@cpmlegal.com

Adam J. Levitt
DICELLO LEVITT & CASEY
LLC
Ten North Dearborn Street,
Eleventh Floor
Chicago, Illinois  60602
Telephone:  312.214.7900
E-mail: alevitt@dlcfirm.com

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC  20006
Telephone: 202.540.7200
Facsimile:  202.540.7201
E-mail: mhausfeld@hausfeld.com

Lesley E. Weaver
BLEICHMAR FONTI & AULD LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
Telephone: 415.455.4003
Facsimile: 415.445.4020
E-mail: lweaver@bfalaw.com

J. Gerard Stranch IV
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
Telephone: 615.254.8801
Facsimile: 615.250.3937
E-mail: gerards@bsjfirm.com

David Seabold Casey, Jr.
CASEY GERRY SCHENK
FRANCAVILLA
BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone: 619.238.1811
Facsimile:  619.544.9232
E-mail: dcasey@cglaw.com

Rosemary M. Rivas, Esq.
LEVI & KORSINSKY LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: 415.291.2420
Facsimile:  415.484.1294
E-mail:  rrivas@zlk.com

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206.623.7292
Facsimile:  206.623.0594
E-mail: steve@hbsslaw.com

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX  75038
Telephone: 214.237.9001
Facsimile:  214.237-9002
E-mail: michael@hop-law.com

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: 206.623.1900
Facsimile: 206.623.3384
E-mail: lsarko@kellerrohrback.com

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
E-mail: jrice@motleyrice.com

Paul J. Geller
ROBBINS GELLER RUDMAN &
DOWD LLP
120 East Palmetto Park Road, Suite
500
Boca Raton, FL 33432
Telephone: 561.750.3000
Facsimile: 561.750.3364
E-mail: pgeller@rgrdlaw.com

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES,
P.C.
319 Seventh Street, Suite 600
Des Moines, IA 50309
Telephone: 515.283.1111
Facsimile: 515.282.0477
E-mail: roxlaw@aol.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005-4401
Telephone: 212.584.0700
Facsimile: 212.584.0799
E-mail: cseeger@seegerweiss.com

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212.784.6400
Facsimile: 212.213.5949
E-mail: jconroy@simmonsfirm.com

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY 10003
Telephone: 212.558.5500
Facsimile: 212.344.5461
E-mail: rgreenwald@weitzlux.com

*Steering Committee and Settlement Class Counsel for Plaintiffs-Appellees*

Samuel Issacharoff
40 Washington Square South
New York, NY 10012
(212) 998-6580
sil3@nyu.edu

*On the Brief*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellees are aware of 29 related appeals, in addition to those that have been consolidated for the instant briefing, which are pending before this Court and arise from the same multidistrict litigation in the district court. The appeal numbers are: 16-17060, 17-15512, 17-15632, 17-15742, 17-15835, 17-16018, 17-16020, 17-16066, 17-16067, 17-16068, 17-16089, 17-16092, 17-16099, 17-16123, 17-16124, 17-16128, 17-16130, 17-16131, 17-16132, 17-16156, 17-16157, 17-16158, 17-16170, 17-16172, 17-16180, and 17-16279.

## CERTIFICATE OF SERVICE

I, Elizabeth J. Cabraser, hereby certify that on July 5, 2017, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

**Form 8.**  **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>16-16731, et al.</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is [＿＿＿＿＿] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [＿＿＿＿＿] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [15,366] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☒ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [＿＿＿＿＿＿＿＿]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [＿＿＿＿＿] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2
(a) and is [＿＿＿＿＿] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2
(c)(2) or (3) and is [＿＿＿＿＿] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [＿＿＿＿＿] words or [＿＿＿＿＿] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant [ s/ Elizabeth J. Cabraser ]  Date [ July 5, 2017 ]

("s/" plus typed name is acceptable for electronically-filed documents)