UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Nos. 16-16731, 16-17035, 16-17129, 16-17133, 16-17155, 16-17157, 16-17158, 16-17166, 16-17168, 16-17181, 16-17183, 16-17185

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

JASON HILL, *et al.*,

*Plaintiffs-Appellees,*

v.

VOLKSWAGEN AG, *et al.*,

*Defendants-Appellees.*

Appeals from the U.S. District Court for the Northern District of California
The Honorable Charles R. Breyer
District Court Case No. 3:15-MDL-2672-CRB

**ANSWERING BRIEF OF
THE VOLKSWAGEN DEFENDANTS-APPELLEES**

Robert J. Giuffra, Jr.
Sharon L. Nelles
William B. Monahan
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000

*Attorneys for Defendants-Appellees
Volkswagen AG, Volkswagen Group of
America, Inc., and Audi AG*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees Volkswagen AG ("VWAG"), Volkswagen Group of America, Inc. ("VWGoA") and Audi AG certify as follows:  (i) VWAG is the parent corporation of VWGoA and Audi AG; (ii) VWAG is a publicly-held German corporation that owns 10% or more of the stock of VWGoA and Audi AG; and (iii) Porsche Automobil Holding SE is a publicly-held corporation that owns 10% or more of the stock of VWAG.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT....................................................i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ........................................................ iiv

INTRODUCTION.........................................................................1

STATEMENT OF JURISDICTION ..............................................5

STATEMENT OF THE ISSUES...................................................6

STATEMENT OF THE CASE.......................................................7

    A.    The Clean Air Act ...................................................................7

    B.    The Notices of Violation ........................................................8

    C.    The Complaints and the Formation of the MDL.................10

    D.    Interrelated Settlement Agreements ....................................13

    E.    Preliminary Approval of the Class Action Settlement and Provision of Notice................................................................21

    F.    Fleshman's Motion to Intervene in the Consumer Class Action ........22

    G.    Partl's Motion to Belatedly Opt Out of the Settlement.......................23

    H.    Final Approval of the Class Action Settlement, and Entry of the DOJ Consent Decree and the FTC Order............................24

    I.    Settlement Implementation .................................................27

SUMMARY OF ARGUMENT.....................................................28

ARGUMENT ................................................................................30

I.    THE COURT SHOULD AFFIRM THE SETTLEMENT APPROVAL ORDER.............................................................30

    A.    Standard of Review .............................................................30

    B.    The Class Action Settlement Provides Substantial Compensation to Class Members......................................30

    C.    The Participation in Settlement Negotiations of Several Government Agencies, as Well as Director Mueller, Ensured a

Settlement and a Process that Was Fair, Adequate, Reasonable and Free of Collusion .................................................................35

D. The Settlement Class's Overwhelming Response to the Settlement Is a Strong Indicia of Its Reasonableness ........................37

II. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN OVERRULING FLESHMAN'S OBJECTION TO THE SETTLEMENT**.................................................................**38**

A. Standard of Review .............................................................38

B. No Government Has Taken Any Action, or Even Expressed the Intention, to Penalize Consumers for Continued Operation of the Vehicles .........................................................................38

C. The Vehicles Are Not Illegal to Drive Under Virginia Law...............40

III. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING PARTL'S BELATED MOTION TO OPT OUT OF THE SETTLEMENT** .................................................................**42**

A. Standard of Review .............................................................42

B. Partl's Failure to Follow the Clear Opt-Out Procedure Described in the Notice Does Not Constitute Excusable Neglect ......43

C. Partl's Remaining Contentions Lack Merit.........................................47

**CONCLUSION**.................................................................**50**

**STATEMENT OF RELATED CASES**.................................................................**51**

**CERTIFICATION OF COMPLIANCE** .................................................................**52**

**CERTIFICATE OF SERVICE** .................................................................**53**

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ................................................................ 36

*Brannon* v. *Household Int'l Inc.*,
    236 F. App. 285 (9th Cir. 2007) .................................... 43, 44, 45, 46

*In re Cathode Ray Tube Antitrust Litig.*,
    2014 WL 4446294 (N.D. Cal. Sept. 8, 2014) ........................... 45, 46

*In re Charles Schwab Corp. Sec. Litig.*,
    2010 WL 2178937 (N.D. Cal. May 27, 2010) .......................... 44, 48

*In re Charles Schwab Corp. Sec. Litig.*,
    2011 WL 855817 (N.D. Cal. Mar. 9, 2011) ................................... 44

*Churchill Vill., LLC* v. *Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ........................................................ 37

*Exxon Mobil Corp.* v. *EPA*,
    217 F.3d 1246 (9th Cir. 2000) ................................................ 40, 41

*Flores* v. *Medifit Corp. Serv. Inc.*,
    2017 WL 550212 (N.D. Cal. Feb. 10, 2017) ................................. 45

*Garner* v. *State Farm. Mut. Auto Ins. Co.*,
    2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .............................. 35

*In re Gypsum Antitrust Cases*,
    565 F.2d 1123 (9th Cir. 1977) ...................................................... 45

*Hanlon* v. *Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................ 30, 37

*AE ex rel. Hernandez* v. *Cnty. of Tulane*,
    666 F.3d 631 (9th Cir. 2012) ........................................................ 23

*Jensen Family Farms* v. *Monterey Bay Unified Air Pollution Control Dist.*,
644 F.3d 934 (9th Cir. 2011) ....................................................... 40, 41

*Kyle* v. *Campbell Soup Co.*,
28 F.3d 928 (9th Cir. 1994) ........................................................ 45, 46

*Lane* v. *Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ...................................................... 30, 38

*Marshall* v. *Holiday Magic, Inc.*,
550 F.2d 1173 (9th Cir. 1978) .......................................................... 35

*Officers for Justice* v. *Civil Serv. Comm'ns of S.F.*,
688 F.2d 615 (9th Cir. 1982) ...................................................... 30, 35

*Rodriguez* v. *W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ............................................................ 36

*Russell* v. *United States*,
2010 WL 1691634 (N.D. Cal. Apr. 23, 2010) ................................... 44

*Silber* v. *Mabon*,
18 F.3d 1449 (9th Cir. 1994) ................................................... *passim*

*Sims* v. *Fla. Dept. of Highway Safety & Motor Vehicles*,
862 F.2d 1449 (11th Cir. 1989) .................................................. 41, 42

*In re TracFone Unlimited Serv. Plan Litig.*,
112 F. Supp. 3d 993 (N.D. Cal. 2015) ................................. 33, 35, 38

*Tri-Valley CAREs* v. *U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012) ......................................................... 23

*United States* v. *Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990) .............................................................. 35

## STATUTES

28 U.S.C. § 1291 ............................................................................... 6

28 U.S.C. § 1331 ............................................................................... 5

28 U.S.C. § 1332 ............................................................................... 5

42 U.S.C. § 7401 ............................................................................................ 7

42 U.S.C. § 7507 .......................................................................................... 41

42 U.S.C. § 7543 .......................................................................................... 41

9 Va. Admin. Code § 5670(A) ...................................................................... 40

## OTHER AUTHORITIES

13 C.C.R. § 1961(d) ....................................................................................... 8

13 C.C.R. § 1961.2(d) .................................................................................... 8

40 C.F.R. § 86.1803-01 .................................................................................. 8

40 C.F.R. § 86.1809-01 .................................................................................. 8

40 C.F.R. § 86.1809-10 .................................................................................. 8

40 C.F.R. § 86.1809-12 .................................................................................. 8

40 C.F.R. § 86.1844-01 .................................................................................. 8

N.D. Cal. L.R. 7-3 ........................................................................................ 48

## INTRODUCTION

This appeal concerns one of a series of interrelated settlements negotiated—under the supervision of a court-appointed settlement master, former FBI Director Robert S. Mueller III—among: (i) Volkswagen AG ("VWAG"), Volkswagen Group of America, Inc. ("VWGoA") and Audi AG (together, "Volkswagen"); (ii) a nationwide class of consumers represented by a Plaintiffs' Steering Committee ("PSC") consisting of 22 of the best plaintiffs' lawyers in the country; (iii) the United States Department of Justice ("DOJ"), on behalf of the United States Environmental Protection Agency ("EPA"); (iv) the Federal Trade Commission ("FTC"); and (v) the California Attorney General, on behalf of the California Air Resources Board ("CARB"). The settlements resolve consumer and environmental claims based on the allegation that Volkswagen marketed and sold in the United States approximately 490,000 diesel engine vehicles in which so-called "defeat devices" designed to evade federal and state emissions regulations had been installed.

After months of sustained and intense negotiations under the guidance of Director Mueller, the parties entered into three interrelated settlements—a consumer class action settlement (the "Class Action Settlement" or the "Settlement") resolving, on a class-wide basis, the claims of owners and lessees of the relevant vehicles; a partial consent decree that resolved the DOJ's, EPA's and

California's environmental claims (the "DOJ Consent Decree"); and a partial consent order with the FTC that resolved the FTC's consumer claims (the "FTC Order"). The settlements provide for up to *$10 billion* of relief directly to current vehicle owners and lessees, including by giving them the choice of either an approved emissions modification or a vehicle buyback (or, for lessees, a lease termination without penalty). The relief is designed to provide consumers the same value as they would have obtained for their vehicles before Volkswagen's conduct became public. In either case (approved modification or buyback/lease termination), consumers are entitled to the payment of restitution. The settlements further provide an additional *$4.7 billion* to fully remediate the environmental harm resulting from Volkswagen's conduct.

Following an extensive notice campaign to members of the then-putative settlement class (a period of almost two months within which members could object to, or opt out of, the proposed settlement), less than 1% of the class opted out, and approximately 0.1% of the class objected. In October 2016, the District Court (Breyer, J.) approved the Class Action Settlement and entered the DOJ Consent Decree and the FTC Order. In accordance with each of those agreements, Volkswagen began implementing the settlements immediately.

Despite the District Court's conclusion that the Class Action Settlement was fair, adequate and reasonable, the more than $10 billion in relief

provided for by the Class Action Settlement, the additional $4.7 billion in relief to fully remediate the environmental harm, and the months' long settlement negotiations under the oversight of FBI Director Mueller, Appellants now challenge the Class Action Settlement for a variety of reasons, including that the Settlement purportedly is not fair, adequate and reasonable and that the Settlement subjects Virginia consumers to potential liability by permitting them to operate their vehicles in violation of law. None of these challenges has merit.[1]

*First,* the Class Action Settlement provides consumers with relief sufficient to compensate them for the pre-disclosure value of their vehicles, and for many consumers, it provides them with compensation *in excess* of the pre-disclosure value of their vehicles.

*Second,* two federal regulators, the EPA and the FTC, which are charged with protecting environmental and consumer welfare, respectively, were involved in the settlement negotiations and ensured that the interrelated settlements would serve the public interest. The settlements were adjudged to be fair not just by the District Court but also by these agencies.

---

[1] The PSC has filed a comprehensive brief on appeal explaining why each of the various other challenges raised on appeal should be rejected. Volkswagen joins in those arguments and will not repeat those arguments here.

*Third*, the consumer class has responded overwhelmingly to the Settlement, and in the eight months since the District Court approved the Class Action Settlement, more than 300,000 class members have received benefits under the Class Action Settlement in the form of vehicle buybacks, approved emissions modifications accompanied by a restitution payment and restitution payments to former owners and lessees who no longer possess their vehicles.

*Fourth,* the Class Action Settlement does not violate Virginia law. Both the EPA and CARB have stated that the vehicles are legal to drive, and a Virginia court has already stated that this "illegality" argument is "pure speculation."

*Finally*, one member of the class (Tori Partl) has claimed on appeal that the District Court improperly refused to consider her late-filed request to opt-out of the Settlement. But Partl does not dispute that she received timely notice of the Settlement, and the notice clearly stated the means by which a consumer seeking exclusion from the class was required to take in order to opt out of the Settlement. Partl indisputably failed to follow that process. The District Court acted well within the bounds of its discretion by denying her request to file a belated opt-out.

## STATEMENT OF JURISDICTION

The District Court originally had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

On August 17, 2016, the District Court denied Fleshman's motion to intervene. Fleshman filed a notice of appeal from that order on September 16, 2016. (Fleshman ER 880.)[2]

On October 25, 2016, the District Court entered an order approving the Class Action Settlement. Appellants Daniel Ancona, Marc Chechik, Christopher D'Angelo, Ronald Fleshman Jr., Derek R. Johnson, Jolian Kangas, Andres and Maria Lujan, Greg and Scott Siewert, Rudolf Sodamin and Marcia Weese filed notices of appeal from that order between October 26, 2016 and November 23, 2016. (*See* Ancona ER 280; Chechik ER 49-50; D'Angelo ER 1896-97; Fleshman ER 462-63; Johnson ER 1; Kangas ER 679-80; D'Angelo ER 4859-60; Siewert ER 90, Sodamin ER 3; Sodamin ER 1.)[3]

---

[2] All references to Fleshman's Excerpts of Record, Appeal No. 16-17183, ECF No. 29-1, are cited as "Fleshman ER [ ]." All references to Defendant-Appellees' Supplemental Excerpts of Record, filed contemporaneously herewith, are cited as "SER [ ]."

[3] All references to Kangas's Excerpts of Record, Appeal No. 16-17035, ECF No. 14-1, are cited as "Kangas ER [ ]"; references to Ancona's Excerpts of Record, Appeal No. 16-17129, ECF No. 41-1, are cited as "Ancona ER [ ]"; references to D'Angelo's and Lujan's Excerpts of Record, Appeal No. 16-16731, ECF No. 59-1, are cited as "D'Angelo ER [ ]"; references to Sodamin's and Weese's Excerpts of

On October 27, 2016, the District Court denied Partl's motion to belatedly opt out of the settlement class. Partl filed a notice of appeal from that order on November 10, 2016. (Partl ER 39-43.)

This Court has jurisdiction over these appeals pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court abused its discretion in approving the Class Action Settlement as fair, reasonable and adequate, where the Class Action Settlement: (a) compensates class members for the value of their vehicles before issuance of the EPA's and CARB's September 18, 2015 Notices of Violation ("NOVs"), and also provided settlement class members with substantial additional restitution; (b) was an integral component of a broad set of interrelated settlements negotiated for months by the DOJ, the EPA, CARB, the FTC, the California Attorney General, and the court-appointed PSC comprised of 22 of the best plaintiffs' lawyers in the country, under the supervision of former FBI Director, Robert S. Mueller III, as Settlement Master; (c) was overwhelmingly

Record, Appeal No. 16-16731, ECF No. 30-1, are cited as "Sodamin ER [ ]"; references to the Siewerts' Excerpts of Record, Appeal No. 16-17168, ECF No. 20-1, are cited as "Siewert ER [ ]"; references to Chechik's Excerpts of Record, Appeal No. 16-17181, ECF No. 37-1, are cited as "Chechik ER [ ]"; and references to Johnson's Excerpts of Record, Appeal No. 16-17185, ECF No. 43-1, are cited as "Johnson ER [ ]."

endorsed by members of the putative settlement class; (d) was adjudged to be fair by not just the District Court but also the United States; and (e) was free of any collusion?

2.      Whether the District Court abused its discretion in overruling Fleshman's objection that the Settlement should be rejected because it purportedly allows consumers to continue to drive their vehicles in violation of Virginia law, when:  (a) the EPA and CARB have previously stated that the vehicles are legal to drive; (b) a Virginia court that previously considered this issue ruled that Fleshman's argument was "pure speculation;" and (c) the law cited by Fleshman is an anti-tampering provision that merely prohibits a vehicle owner from removing or rendering inoperable the vehicle's pollution control system, and does not reach the pre-sale, manufacturer conduct at issue in this action?

3.      Whether the District Court abused its discretion in denying Partl's motion to belatedly opt out of the Settlement where Partl admits that she received notice of the Settlement and of the procedures for opting out of the Settlement, but indisputably failed to follow those procedures?

## STATEMENT OF THE CASE

A.      **The Clean Air Act**

Under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, to sell a new motor vehicle in the United States, a vehicle manufacturer must obtain a

certificate of conformity ("COC") from the EPA. 40 C.F.R. § 86.1843-01. In its application for a COC for each group of test vehicles that it intends to sell in the United States, the manufacturer must disclose, *inter alia*, all auxiliary emissions control devices ("AECDs") installed on the vehicles. 40 C.F.R. § 86.1844-01(d)(11). Similarly, to receive an executive order certifying a new motor vehicle for sale in California, a manufacturer must submit a certification application to CARB that list all AECDs installed on the relevant vehicles, including a justification for each AECD. *See* 13 C.C.R. §§ 1961(d), 1961.2(d).

An AECD is an element of the vehicle's design that senses temperature, speed, engine RPM, or any other parameter for the purpose of modulating or deactivating the operation of any part of the vehicle's emission control systems. 40 C.F.R. § 86.1803-01. An AECD that bypasses or reduces the effectiveness of the vehicle's emission control systems under normal operation is considered to be, with certain exceptions, a "defeat device" under federal law. 40 C.F.R. § 86.1803-01; *see also* 13 C.C.R. §§ 1961(d), 1961.2(d). Vehicles equipped with defeat devices cannot be certified for operation in the United States. *See* 40 C.F.R. §§ 86.1809-01, 86.1809-10, 86.1809-12.

B.     **The Notices of Violation**

On September 18, 2015, the EPA and CARB issued separate notices of violation to Volkswagen, alleging that Volkswagen installed "defeat device"

software in certain model year 2009-2015 2.0-liter diesel vehicles sold in the United States (collectively, the "Subject Vehicles"), in violation of the CAA and California law. (Fleshman ER 916 (EPA NOV); SER 688-90 (CARB NOV).) According to the NOVs, the defeat devices detected when the Subject Vehicles were being tested on a dynamometer for compliance with U.S. emissions standards. (Fleshman ER 918-19; *see also* SER 689-90.) If that occurred, the Subject Vehicles' full emissions controls activated, producing compliant emissions results. (Fleshman ER 919; *see also* SER 689-90.) If, however, the defeat device detected that the Subject Vehicles were being driven on the road, the Subject Vehicles' full emissions controls were not activated, and the Subject Vehicles emitted more NOx than on the dynamometer. (Fleshman ER 919; *see also* SER 689-90.)[4]

By their terms, the NOVs did not prohibit vehicle owners or lessees from continuing to drive the Subject Vehicles. (*See* Fleshman ER 916-21; SER

---

[4] On November 2, 2015, the EPA and CARB each issued another NOV alleging that Volkswagen installed "defeat device" software in certain *3.0*-liter diesel vehicles. (SER 751-56 (EPA); SER 685-87 (CARB).) The Class Action Settlement at issue on the instant appeals concerns only the affected *2.0*-liter vehicles. After the filing of the instant appeals, the parties reached (and the District Court approved) interrelated settlements that comprehensively resolve the claims relating to the 3.0-liter vehicles. Appeals have since been filed with respect to the 3.0-liter settlement, and those appeals will be addressed on a separate schedule directed by the Court.

688-90.)  In fact, in a press release the EPA issued the same day it issued its NOV, the EPA informed consumers "that although these vehicles have emissions exceeding standards, those violations *do not present a safety hazard* and the cars *remain legal to drive*."  (Fleshman ER 924 (emphasis added).)  Similarly, in a CARB press release, CARB informed consumers that "although these vehicles have emissions exceeding standards, these violations do not present a safety hazard and *the cars remain legal to drive and resell*."  (SER 692 (emphasis added).)

C.    **The Complaints and the Formation of the MDL**

In the wake of the issuance of the NOVs, owners and lessees of the Subject Vehicles, as well as certain used car dealers (also known as re-seller dealers), filed hundreds of individual and putative class action lawsuits across the country.  Beginning in December 2015, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the actions that had been filed in, or removed to, federal court to a multidistrict litigation ("MDL") before the Honorable Charles R. Breyer.  On January 21, 2016, Judge Breyer appointed Lead Counsel for the putative classes (Elizabeth Cabraser) and a 22-member PSC to conduct and coordinate the pretrial stage of the MDL on behalf of the putative classes. (Johnson ER 358-62.)

On January 4, 2016, the DOJ, on behalf of the EPA, filed a complaint against Volkswagen (the "DOJ-EPA Action") in the U.S. District Court for the

Eastern District of Michigan. (*See* SER 720-50.) In its complaint, the DOJ alleged that each of the Subject Vehicles included a defeat device in violation of the CAA and that, as a result of the defeat device, the Subject Vehicles emitted NOx in excess of CAA-compliant levels during normal vehicle operation. (*See* SER 732-34, 739-745.) The DOJ-EPA Action sought, among other things, injunctive relief to remedy the alleged violations, including an order requiring Volkswagen to mitigate the excess NOx emissions, as well as civil penalties. (*See* SER 745-47.) The JPML transferred the DOJ-EPA Action to the MDL on January 15, 2016. (*See* SER 600-01.)

On February 22, 2016, the PSC filed three consolidated complaints on behalf of nationwide putative classes of consumers and dealers. The first complaint asserted claims on behalf of all persons in the United States who purchased or leased a Subject Vehicle, alleging claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Magnusson-Moss Warranty Act and the consumer protection laws of all fifty states, as well as common law fraud, contract and unjust enrichment claims. (Ancona ER 305-1023.) The second complaint asserted claims on behalf of all dealers in the United States with one or more previously owned Subject Vehicles in inventory as of September 18, 2015, asserting RICO claims and common law fraud, failure to

recall and unjust enrichment claims.  (SER 565, 570-93.)[5]  The PSC later amended

those complaints.  (Fleshman ER 1085-1826; SER 252-367.)

The PSC's amended complaints alleged that while Volkswagen was

using defeat devices to cheat emission tests, it marketed and sold the Subject

Vehicles as "clean diesel" vehicles without disclosing to consumers that the

vehicles produced excess emissions if the defeat device detected that the vehicles

were not being tested.  (Fleshman ER 1265-1281; SER 300-316.)  The amended

complaints sought, among other things, (i) to compel Volkswagen to institute a

program to repair, retrofit and/or buyback all Subject Vehicles; (ii) environmental

reparations, mitigation and remediation to offset the harm caused by the excess

NOx emissions; (iii) economic, treble and punitive damages; and (iv) rescission of

all purchases and leases.  (Fleshman ER 1823; SER 364-65.)

On March 29, 2016, the FTC filed suit against Volkswagen in the

Northern District of California, alleging violations of the Federal Trade

Commission Act ("FTC Act").  (*See* SER 698-716.)  The action was then

consolidated into the MDL.  (*See* SER 718.)  The complaint alleged that

Volkswagen engaged in deceptive and unfair acts or practices in violation of

---

[5] The third complaint, filed on behalf of dealerships purportedly in competition
with Volkswagen and Audi dealerships, is not the subject of this appeal or the
Class Action Settlement.

Section 5(a) of the FTC Act through the advertising, marketing and distribution of the Subject Vehicles. (*See* SER 701-10.) The FTC sought an injunction to prevent further violations of the FTC Act, as well as all other relief "necessary to redress the injury to consumers resulting from [Volkswagen's conduct], including, but not limited to . . . reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten profits." (SER 714.)

On June 27, 2016, the State of California, on behalf of CARB, filed suit against Volkswagen in the Northern District of California, alleging violations of the Consumer Financial Protection Act, 12 U.S.C. § 5536, and various California state laws. (*See* SER 658-81.) The action was also consolidated into the MDL. (*See* SER 696.) California alleged claims similar to those raised in the DOJ-EPA Action, except specific to California and its residents. (*See* SER 624-684.)

D. **Interrelated Settlement Agreements**

From the outset of the case, Judge Breyer urged the parties to pay "significant attention to immediate resolution of these cases" so that the vehicles were either removed from the road or fixed as quickly as possible. (SER 607; *see also* SER 505.) To that end, in January 2016 (a month after formation of the MDL), the District Court appointed former FBI Director, Robert S. Mueller III, as

Settlement Master to oversee comprehensive settlement negotiations between the various parties. (Fleshman ER 716; *see also* SER 597-98.)

As Director Mueller stated in a declaration he submitted in the District Court, the settlement negotiation process

> was iterative and had multiple moving parts and shifting dynamics because it had to address the needs and interests of consumers and state and federal government entities. The parties had overlapping claims and authority . . . . [N]o single party could, as a jurisdictional or practical matter, obtain and enforce all the relief sought.

(Fleshman ER 718.) Director Mueller explained that this reality complicated the settlement process, "as did the effort to file and coordinate all government and consumer materials in a single comprehensive resolution in one court." (Fleshman ER 718.)

After extensive negotiations, under the oversight of Director Mueller, among all relevant stakeholders, Volkswagen, the PSC, the EPA, the DOJ, CARB, the FTC, and the California AG reached comprehensive, interrelated settlements, which they filed on June 28, 2016:

- The Consumer Class Action Settlement, which the parties amended on July 26, 2016 (the "Class Action Settlement"; Fleshman ER 1957-2056), concerning the claims asserted by the PSC on behalf of the putative classes of consumer and re-seller dealers with respect to the Subject Vehicles;

- The Partial Consent Decree, which the parties amended on September 30, 2016 (the "DOJ Consent Decree"; Fleshman ER

490-551), which resolved the claims asserted in the DOJ-EPA Action for injunctive relief concerning the Subject Vehicles, as well as California's injunctive relief claims concerning the Subject Vehicles;[6] and

- The Partial Consent Order (the "FTC Order"; SER 94-251), which resolved the FTC's claims concerning the Subject Vehicles.

Collectively, the settlements provide a comprehensive scheme to fully remedy the past, present and future environmental harm caused by the Subject Vehicles, as well as the injury to consumers and re-seller dealers resulting from their purchase or lease of the Subject Vehicles.

### 1. The Class Action Settlement

Under the terms of the Class Action Settlement, Volkswagen agreed that immediately after entry by the District Court of the various interrelated settlements, Volkswagen would pay up to $10.033 billion to compensate up to approximately 490,000 members of a settlement class of owners and lessees, including re-seller dealers, of the Subject Vehicles. (Fleshman ER 1957-1964, 1972-1982, 2100.) As the District Court explained, the consideration provided by the Class Action Settlement was designed to "place Class Members in the same position they were in pre-disclosure [while] also giv[ing] them additional compensation" in the form of substantial restitution. (Ancona ER 21.)

_____

[6] California also separately filed a Partial Consent Decree on July 7, 2016 to resolve its penalty claims concerning the Subject Vehicles. (SER 480-83.)

Eligible owners have the option of either (a) a buyback of the vehicle at its NADA clean trade-in value (adjusted for mileage and options) as of September 2015, prior to the issuance of the EPA's and CARB's NOVs,[7] or (b) an emissions modification, if one is approved by the EPA and CARB, to reduce the excess emissions from the Subject Vehicle ("Approved Emissions Modification"). (Fleshman ER 1972-82, 2011, 2015-16.)  In either case, eligible owners who purchased their car before September 18, 2015 are entitled to an additional restitution payment equal to 20% of the vehicle's value (adjusted for options and mileage) plus $2,987, with a *minimum* payment of $5,100 guaranteed.  (Fleshman ER 1973-74, 2011-12, 2025.)  And eligible owners who purchased their car after the September 18, 2015 NOVs are entitled to a restitution payment equal to 10% of the vehicle's September 2015 NADA clean trade-in value (adjusted for options and mileage), plus $1,529, plus a proportional share of any restitution not claimed by

---

[7] The September 2015 NADA values were published prior to any depreciation in the value of the vehicles that may have resulted from the revelation of the emissions issues in the September 18, 2015 NOVs.  (Kangas ER 1970-71.)  The NADA clean trade-in value is:  (1) where available, the clean trade-in value of the Subject Vehicle based on the NADA Vehicle Identification Code ("VIC") in the September 2015 NADA Used Car Guide published in or around August 2015; and (2) for model year 2015 Subject Vehicles for which no value was published by NADA as of September 2015, derived by multiplying 0.717 by the Manufacturer's Suggested Retail Price for the Subject Vehicle.  (Fleshman ER 1960-61, 2013.)  This amount is then adjusted for mileage (at the time of vehicle surrender) and options to derive the ultimate buyback amount.  (Fleshman ER 1960-61, 2013.)

the seller of the vehicle, with a *minimum* payment of $2,550 guaranteed. (Fleshman ER 1973, 2011-12, 2025.)

Eligible lessees may either terminate their leases without penalty or receive an Approved Emissions Modification, with additional restitution payments equal to 10% of the vehicle's value (adjusted for options) plus $1,529. (Fleshman ER 1973-82, 2012-13, 2025.) Finally, eligible sellers of the Affected Vehicles are entitled to a cash payment equal to 10% of the vehicle's value (adjusted for options and mileage) plus $1,493, with a *minimum* payment of $2,550 guaranteed. (Fleshman ER 1970, 2012, 2025.)

The timeline for the Approved Emissions Modification, as well as the technical requirements that Volkswagen's proposed modifications must satisfy in order to obtain EPA and CARB approval, are detailed in Appendix B of the DOJ Consent Decree (discussed below). (Fleshman ER 1960, 1974-75, 2015-16.) If no Approved Emissions Modification becomes available by the deadlines set forth in the DOJ Consent Decree, eligible owners and lessees of the relevant vehicles will be informed at that time that they remain eligible to participate in the buyback (or lease termination) option, or to opt out of the Class Action Settlement altogether. (Fleshman ER 1975.)

2. <u>The DOJ Consent Decree</u>

The DOJ Consent Decree similarly requires Volkswagen to implement a buyback, lease termination and Approved Emission Modification program to address the excess emissions from the Subject Vehicles. (Fleshman ER 494-495, 503-504.) The DOJ Consent Decree does not, however, provide an independent mechanism to compensate class members. Rather, because of the interrelatedness of the various settlements, the DOJ Consent Decree expressly provides that "the consumer payments required by the FTC Order and the Class Action Settlement . . . and Settling Defendants' offer of buybacks and fulfilment of their buyback obligations under the FTC Order and Class Action Settlement satisfies the [DOJ Consent Decree's] requirements." (Fleshman ER 558.)

The DOJ Consent Decree required Volkswagen to offer the buyback (or lease termination) to eligible owners and lessees almost immediately after entry by the District Court of the interrelated settlement agreements. (Fleshman 558.) Indeed, the DOJ Consent Decree imposes stipulated penalties of up to $50,000 per day if Volkswagen failed to do so within 15 days of the last of the effective dates for the DOJ Consent Decree, the FTC Order and the Class Action Settlement. (Fleshman ER 564.)

Volkswagen also agreed in the DOJ Consent Decree to pay $2 billion over ten years to promote the use of zero emissions vehicle ("ZEV") technology,

such as investments in the development, construction and maintenance of ZEV-related infrastructure, investments to increase access to ZEVs, investments in ZEV education, and investments in California's "Green City" initiative. (Fleshman ER 495, 638-39.) Further, Volkswagen agreed to pay an additional $2.7 billion over three years into an environmental mitigation trust to "fully mitigate the total, lifetime excess NOx emissions from the 2.0 Liter Subject Vehicles." (Fleshman ER 496; *see also* Fleshman ER 672.) The $2.7 billion to be paid into the environmental mitigation trust has been initially allocated to all 50 states, as well as certain territories and tribal governments, to use for specific NOx mitigation activities. (Fleshman ER 696.)

Volkswagen must achieve a "recall rate" of *at least 85%* of the Subject Vehicles by June 30, 2019 (both nationally and in California). In other words, under the DOJ Consent Decree, at least 85% of the Subject Vehicles must either be bought back by Volkswagen or receive an Approved Emissions Modification by June 30, 2019. (Fleshman ER 494-95, 560.) If Volkswagen fails to meet this 85% recall rate, it is required to pay additional funds into the environmental mitigation trust. (Fleshman ER 494-95, 503.) The DOJ Consent Decree provides that for each 1% that the national recall rate falls short of the 85% target, Volkswagen will contribute an additional $85 million to the environmental mitigation trust, and for each 1% that the California recall rate falls short of the

85% target, Volkswagen will contribute an additional $13.5 million to the environmental mitigation trust for mitigation projects in California. (Fleshman ER 560-61.)

### 3. The FTC Order

Designed and drafted to memorialize the same agreement for consumer relief as set forth in the Class Action Settlement, the FTC Order echoes the same fundamental provisions of the Class Action Settlement. For instance, like the Class Action Settlement (and the DOJ Consent Decree), the FTC Order required Volkswagen pay up to $10.033 billion to compensate members of the settlement class. (SER 106.)[8] The FTC Order similarly required implementation of the buyback/lease termination program immediately after entry by the District Court of the FTC Order, the DOJ Consent Decree and the Class Action Settlement. (SER 98, 130.) The FTC Order expressly provides that Volkswagen "may use satisfaction of th[e] [FTC] Order to meet its obligations under the DOJ Consent Decree and/or the Class Action Settlement." (SER 106.)

---

[8] As provided in the Class Action Settlement, the "funding pool from which Class members will be compensated . . . is the same funding pool described in the FTC Consent Order and the DOJ Consent Decree." (Fleshman ER 1967.)

E.    **Preliminary Approval of the Class Action Settlement and Provision of Notice**

On July 26, 2016, the District Court held a hearing to consider whether to preliminarily approve the Class Action Settlement and to provide notice to potential members of the putative settlement class.  (SER 402-79.)  At the hearing, following presentations by Volkswagen and the PSC, the District Court commented on the "enormous effort . . . devoted" by the parties to crafting a comprehensive, interrelated set of settlements, and stated that it would preliminarily approve the Class Action Settlement.  (SER 476.)  The District Court issued an order preliminarily approving the Settlement and providing for notice to potential settlement class members on July 29, 2016 (the "Preliminary Approval Order").  (Fleshman ER 1924.)

The comprehensive notice program required by the Preliminary Approval Order included direct mail notice, email notification, notice by publication, and an extensive digital and social media campaign.  (Fleshman ER 1951-54.)  Potential class members could also visit a website maintained by Volkswagen devoted to the settlements (www.VWCourtSettlement.com) to obtain information that potential class members might find useful to evaluate the settlements.  (Fleshman ER 1953.)

The Long-Form Notice set an objection and opt-out deadline of September 16, 2016 (Fleshman ER 2041; *see also* Fleshman ER 1955) and

informed settlement class members of the procedure for opting out of the Class Action Settlement: by mailing a signed request in writing to the court-appointed claims administrator, on or before the September 16 opt-out deadline, stating that they wished to opt out of the Class Action Settlement. (Fleshman ER 2041; *see also* Fleshman ER 1983-84.)

F. **Fleshman's Motion to Intervene in the Consumer Class Action**

On July 22, 2016, before the deadline for objecting to (or opting out of) the Class Action Settlement had expired, Fleshman moved to intervene in the District Court to challenge the proposed Class Action Settlement. (Fleshman ER 2137-48.) Volkswagen opposed that motion on numerous grounds, including that there was no basis for intervention because Fleshman could opt out of, or object to, the Class Action Settlement by the September 16, 2016 deadline. (Fleshman ER 1915-23.)

On August 17, 2016, the District Court denied Fleshman's motion, holding that he failed to "show that that the Settlement impair[ed] his ability to protect his interests" because he may "opt of the Settlement and litigate his claims independently, or he may instead object to [the Settlement]." (Fleshman ER 66.)

Fleshman filed a notice of appeal from the District Court's August 17, 2016 Order on September 16, 2016. (Fleshman ER 880-81, Appeal No. 16-16731.)[9]

G.    **Partl's Motion to Belatedly Opt Out of the Settlement**

On October 17, 2016—a month after the September 16 deadline to opt out of the Class Action Settlement, and the day before the fairness hearing in the District Court that had been scheduled to consider whether to approve and enter the various interrelated settlements—Tori Partl filed a motion for leave to extend the deadline to opt out of the Class Action Settlement. (Partl ER 1.)

Partl did not dispute in her motion that she timely received notice of the Class Action Settlement and of the procedure for opting out of the Class Action Settlement. Instead, Partl submitted an affidavit stating that she "received an email from 'VW Settlement Update' . . . which instructed [her] to visit www.VWCourtSettlement.com to learn more about proposed settlements of legal claims regarding Volkswagen emission systems." (Partl ER 6.) Partl then stated that, after discussing the Class Action Settlement with her attorney, she visited the

---

[9] Fleshman's opening brief does not discuss the District Court's denial of his July 22, 2016 motion to intervene to challenge the Class Action Settlement. Because Fleshman has "fail[ed] to specifically and distinctly argue the issue in his opening brief," he has waived any challenge to the denial of that motion. *AE ex rel. Hernandez* v. *Cnty. of Tulane*, 666 F.3d 631, 638 (9th Cir. 2012) (internal quotation marks omitted); *see also Tri-Valley CAREs* v. *U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) ("Claims not made in an opening brief in a sufficient manner to put the opposing party on notice are deemed waived.").

website for the settlement, "created a profile, and followed the instructions to opt-out of the settlement." (Partl ER 7.) Notwithstanding this assertion, Partl did not dispute in the District Court (and does not dispute on appeal) that she did not mail a written request seeking exclusion by September 16, 2016 to "Opt Out VW Settlement, P.O. Box. 57424, Washington, DC 20037." (Partl ER 40; *see also* Partl Br.) Partl has not explained (even on appeal) specifically what she claims to have done to attempt to opt out of the Settlement.

On October 27, 2016, the District Court denied Partl's motion ("Partl Belated Opt-Out Order"), ruling that Partl's mistaken belief that she had opted out of the Class Action Settlement did not constitute "good cause" or excusable neglect to permit her to belatedly opt out of the Settlement. (Partl ER 39-41.) The District Court also observed correctly that the "Settlement makes no mention of the class members' ability to request exclusion via the Settlement Website." (Partl ER 41.) Partl filed a notice of appeal on November 10, 2016. (Appeal No. 16-17157.)

H. **Final Approval of the Class Action Settlement, and Entry of the DOJ Consent Decree and the FTC Order**

On October 18, 2016, the District Court held a hearing to consider whether to finally approve the Class Action Settlement with the PSC and to enter the DOJ Consent Decree and the FTC Order. (D'Angelo ER 1.) The District Court heard from 18 settlement class members (or their attorneys) at the hearing. (D'Angelo ER 110; *see also* D'Angelo ER 10-12, 29-63.) One of the class

members (Fleshman) objected on the ground that the Settlement improperly allowed class members to continue driving their Subject Vehicles in violation of Virginia law.  (Fleshman ER 899-900; *see also* D'Angelo ER 29-31.)

On October 25, 2016, the District Court issued an order approving the Class Action Settlement and overruling all objections to the Class Action Settlement (the "Settlement Approval Order").  (Ancona ER 1-48.)[10]  The District Court entered the DOJ Consent Decree and the FTC Order that day as well.  (Fleshman ER 478-89; SER 94-251.)[11]  The District Court stated in the Settlement Approval Order:

> Class Counsel negotiated the Settlement alongside the United States, FTC, and CARB . . . .  As a result, the agreements . . . are inextricably tied to one another . . . [and as] the Settlement Master explain[ed] "this settlement process was iterative and had multiple moving parts . . . because it had to address the needs and interests of consumers and state and federal government entities."

(Ancona ER 23.)[12]  The District Court held that the Settlement was fair, adequate and reasonable for numerous reasons, including:

---

[10] In overruling Fleshman's objection, the District Court explained that "no federal or state authority ha[d] declared the [Subject] Vehicles illegal to drive . . . [and] the EPA has explicitly stated it will not confiscate [the] vehicles."  (Anconca ER 40.)

[11] No appeals have been filed from the District Court's October 25, 2016 Orders entering the DOJ Consent Decree or the FTC Order.

[12] The Court had previously entered the California Consent Decree on September 1, 2016.  (SER 368-97.)

- the overwhelmingly positive reaction of class members, as evidenced by the low opt-out rate (less than 1% of eligible class members);

- the monetary risks associated with continued litigation, such as the potential reduction of any recovery obtained at trial through offsets based on the owners' use of the vehicles;

- the risks associated with class certification, including the potential for class certification to be denied entirely;

- the substantial amount Volkswagen agreed to pay in the Class Action Settlement—up to $10.033 billion—which was designed to "place class members in the same position they were in pre-disclosure [while] also giv[ing] them additional compensation" in the form of a restitution payment;

- the parties' ability to reach a settlement at an early phase of the litigation, which was particularly important here given class members' continued use of the Subject Vehicles during the pendency of litigation;

- the experience and views of the PSC, 22 of the most experienced plaintiffs' lawyers in the country, who believed it was "highly uncertain . . . the Class would be able to obtain and sustain a better outcome through continued litigation";

- the support the Class Action Settlement enjoyed from the FTC, the DOJ, the EPA, CARB and the State of California, among others; and

- the absence of any evidence of collusion.

(Ancona ER 10-43.)

Twelve members of the settlement class have since filed notices of appeal from the Final Approval Order. (Appeal Nos. 16-17035, 16-17129, 16-17133, 16-17155, 16-17158, 16-17166, 16-17168, 16-17181, 16-17183, 16-

17185.)[13]   These appeals have been consolidated with Partl's appeal (Appeal No. 16-17157) and Fleshman's appeal of the District Court's August 17, 2016 denial of his motion to intervene in the Consumer Class Action.  (Appeal No. 16-16731.)[14]

## I.   Settlement Implementation

In accordance with the Class Action Settlement, the DOJ Consent Decree and the FTC Order, Volkswagen began implementing the settlements immediately after the District Court approved them.  (Fleshman ER 1964, 1996, 2000; Fleshman ER 539, 558; SER 98, 130.)  According to the Independent Claims Supervisor, Volkswagen has since "reach[ed] significant benchmarks in its [implementation] of the" settlements.  (SER 33.)   As of June 23, 2017, Volkswagen has reacquired, modified, or otherwise removed from commerce 300,510 vehicles, representing *over 60%* of the Subject Vehicles, and has made payments to over 12,900 former owners or lessees.  (SER 4, 15-16, 30.)  In total,

---

[13]   Six of these appellants—Daniel Ancona, Christopher D'Angelo, Rudolf Sodamin, Marc Chechik, Greg and Scott Siewert, and Andres Lujan—have since released Volkswagen from all claims related to the "2.0-liter TDI matter . . . even if the Final Approval Order is reversed and/or vacated on appeal."  (Kangas ER 151; *see also* Kangas ER 82.)  Those appellants should have dismissed their appeals.

[14] As stated *supra* at note 9, Fleshman has waived any challenge to the denial of his motion to intervene.  Fleshman also filed a separate notice of appeal with respect to the District Court's Final Approval Order, making the argument that the Settlement should not have been approved because it purportedly violated Virginia law.

Volkswagen has *already* paid approximately *$6.3 billion* to consumers who participated in the Class Action Settlement. (SER 4.)

Notably, these results have been achieved only 8 months after approval of the settlements, even though class members have until September *2018* to file a claim under the Settlement. (SER 4; Fleshman ER 1961, 2026.) As stated by the Independent Claims Supervisor, "[c]onsumer response to the [S]ettlement has been considerable." (SER 34.)

## SUMMARY OF ARGUMENT

***This Court Should Affirm the Settlement Approval Order.*** The settlements were the product of arm's length negotiations between numerous parties, including a regulator (the FTC) whose job was to ensure that consumers were fully compensated for Volkswagen's conduct and a PSC comprised of 22 of the most experienced plaintiffs' lawyers in the country. Those negotiations resulted in Volkswagen agreeing to pay up to 10.033 billion to remedy consumer harm resulting from Volkswagen's conduct. As the FTC has stated, the settlements "fully compensate[] [Volkswagen's] victims." The Class Action Settlement has also been embraced by eligible consumers, with an opt-out rate of less than 1%. That is no surprise, as the 85% recall rate under the related DOJ Consent Decree incentivized Volkswagen to design an attractive settlement program that would entice consumers to participate in the Class Action Settlement.

***The District Court Did Not Abuse Its Discretion in Rejecting Fleshman's Objection.*** The EPA and CARB have stated that the Subject Vehicles are legal to drive, and a Virginia court has already rejected as "pure speculation" Fleshman's argument. Indeed, the Virginia provision Fleshman contends prohibits the continued use and operation of the Subject Vehicles is an anti-tampering provision that only prohibits consumers from removing or rendering inoperable the vehicle's pollution control system. The Virginia provision does not reach the pre-sale, manufacturer conduct at issue in the amended consumer class action complaint.

***This Court Should Affirm the Partl Belated Opt-Out Order.*** The District Court did not abuse its discretion in concluding that Partl did not show the requisite good cause or "excusable neglect" for failing to follow the opt-out procedures specified in the settlement notice. The notice, which Partl admits she received, unambiguously required Partl to mail a written notice to the claims administrator stating that she wished to opt out of the Settlement. Partl admits that she did not do so. Her subjective belief, unsupported by anything in the notice (or elsewhere), that she could opt out of the Settlement apparently by registering on the Volkswagen settlement website was not justified and should not be excused.

**ARGUMENT**

## I.    THE COURT SHOULD AFFIRM THE SETTLEMENT APPROVAL ORDER

### A.    Standard of Review

Appellate review of a district court's order approving a class action settlement "is extremely limited, and [the Court] will set aside that determination only upon a 'strong showing' that the district court's decision was a clear abuse of discretion." *Lane* v. *Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012). The question for the Court "is not whether the final product could be prettier, smarter or snazzier," *Hanlon* v. *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), but whether the settlement, taken as a whole, is fair, adequate, reasonable and free from collusion. *Lane*, 696 F.3d at 818-19. While "it may be unavoidable that some class members will always be happier with a given result than others," *Officers for Justice* v. *Civil Serv. Comm'ns of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982), dissatisfaction with a fair, adequate, reasonable and non-collusive settlement does not warrant the unwinding of a settlement. *See Lane*, 696 F.3d at 818-19.

### B.    The Class Action Settlement Provides Substantial Compensation to Class Members

As the District Court observed, the "combination of these agreements"—the Class Action Settlement, the DOJ Consent Decree and the FTC

-30-

Order—provides "payment of substantial compensation to the consumer class members in connection with the car buy back, the car modification, and cancellation of lease options." (SER 489.) And as the DOJ stated, the settlements "collectively provide comprehensive environmental and consumer relief." (Fleshman ER 784; *see also* SER 488-89.)

The Settlements provide cash payments to consumers that *exceed* the retail value of the Subject Vehicles in September 2015, before the existence of the defeat device was publicly disclosed in the EPA's and CARB's NOVs. (*See* Ancona ER 20; Kangas ER 1971.) The buyback available to eligible owners uses the NADA clean trade-in value of the Subject Vehicles, which was published before the EPA and CARB issued their NOVs, and thus reflects the value of the Subject Vehicles before the market learned of the defeat device issues, *i.e.*, the value an owner would have received for her Subject Vehicle if she traded it on September 17, 2015. (Kangas ER 1963-64.) Using this as the base value substantially benefitted class members for at least two reasons: (1) it avoided any price depreciation of the Subject Vehicles that occurred after Volkswagen's conduct was made public, and (2) it allowed class members to continue to use their vehicles without a reduction in value for age-related depreciation. (Kangas ER 1963-64.)

The value of the vehicle (adjusted for options and mileage) only represented, however, a portion of the compensation owners were entitled to receive. Owners also received substantial restitution. In fact, under the Class Action Settlement, eligible owners receive a *minimum* restitution of $5,100, and can receive a payment well in excess of that amount. As the FTC has explained, consumers are made whole when they receive the "full retail value" of a good, because the retail value represents the amount it would cost the consumer to obtain that good in the market. (SER 398.) Here, however, the combined payment (buyback plus restitution) compensates the average class member with *112.6%* of the September 2015 *retail* value of their vehicles. (Kangas ER 1971.) Thus, the Settlement "places consumers in a position to replace their vehicles at September 2015 [pre-emission disclosure] retail value and receive additional real economic benefits." (Kangas ER 1976.)

The FTC, whose job is to protect consumers from deceptive and unfair business practices and enhance consumer choice, explained that it "strongly supports the . . . $10 billion 2.0L 'Clean Diesel' settlement, [because it] *fully compensates* victims of Volkswagen's . . . deception . . . [by providing consumers compensation equal to the] full retail value [of the Subject Vehicles plus] all other losses caused by Volkswagen's deception." (SER 398; *see also* D'Angelo ER 93 (emphasis added).) Accordingly, the FTC concluded that the Class Action

Settlement was "clearly in the public interest. Indeed, if it were not, the FTC would have never approved the same amounts in its settlements." (SER 399.) *See In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1006 (N.D. Cal. 2015) (FTC's endorsement of consumer settlement that was "reached at the same time [as FTC's settlement and] as part of a global settlement . . . counsel[ed] in favor of" approving the consumer settlement).

The relief provided to eligible lessees under the Class Action Settlement is also fair, reasonable, and adequate. Lessees may, like owners, relinquish their vehicles (here, through lease terminations) or retain their vehicles and receive an Approved Emissions Modification. (Fleshman ER 1973-82, 2012-13, 2025.) No matter their election, eligible lessees also receive a substantial restitution payment. (Fleshman ER 1973-82, 2012-13, 2025.) Lessees, unlike owners, do not bear the risk of any depreciation of the vehicle during the course of ownership of the vehicle. Therefore, the restitution is smaller than that contemplated for owners. Nevertheless, the restitution will compensate them for any loss in value of their leasehold resulting from Volkswagen's conduct. (*See* Kangas ER 1974.)

With respect to eligible sellers, the Class Action Settlement makes them whole by providing them with restitution designed to eliminate the difference between the pre- and post-disclosure values of the Subject Vehicles. Eligible

Sellers sold their vehicles after the publication of the EPA and CARB NOVs, and thus their sale price would reflect any diminution in value caused by the defeat device disclosure. The Class Action Settlement accounts for the difference between the pre- and post-disclosure values by offering eligible sellers a restitution payment equal to 10% of the Vehicle Value plus $1,493, with a guaranteed minimum restitution payment of $2,550. (Fleshman ER 1970, 2012, 2025.)

The reasonableness of the settlement is not surprising given the significant incentives *to Volkswagen* to enter into a settlement that class members would accept. Under the DOJ Consent Decree, Volkswagen must achieve a "recall rate" of *at least 85%* of the Subject Vehicles by June 30, 2019 (both nationally and in California), either through buybacks or through Approved Emissions Modifications, or else pay significant additional amounts into the environmental mitigation trust. (*See* Fleshman ER 494-95, 503.) Thus, Volkswagen was financially incentivized by the DOJ Consent Decree to make the compensation offered in the Class Action Settlement very attractive for class members.[15]

---

[15] Moreover, any harm to the environment—which consumers did not have standing to address—is remedied by the DOJ Consent Decree, which requires Volkswagen to pay $2 billion over ten years to promote the use of ZEV technology and further requires Volkswagen to pay an additional $2.7 billion over three years into an environmental mitigation trust to "*fully mitigate* the total, lifetime excess NOx emissions from the 2.0 Liter Subject Vehicles." (Fleshman ER 496, 672 (emphasis added).)

C.   **The Participation in Settlement Negotiations of Several Government Agencies, as Well as Director Mueller, Ensured a Settlement and a Process that Was Fair, Adequate, Reasonable and Free of Collusion**

The participation by numerous government agencies in settlement negotiations further supports the conclusion that the Class Action Settlement is fair, adequate and reasonable. *See Marshall* v. *Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1978) ("The participation of a government agency serves to protect the interest of the class members . . . and approval by the agency is an important factor" in determining the fairness of the settlement); *Officers for Justice,* 688 F.2d at 625 (explaining that "the presence of a government participant" is a significant factor bearing on the fairness of a settlement); *United States* v. *Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("Where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing [a] proposed settlement," deference is due); *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d at 1006 (explaining that government's participation in settlement discussions and failure to raise any objection "to the proposed settlement . . . weighs in favor of . . . approval"); *Garner* v. *State Farm. Mut. Auto Ins. Co.*, 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (explaining that the participation of government actors in settlement

is a strong indicia of fairness because "once put on notice, [government] officials will [typically] raise any concerns that they may have").[16]

Further, the presence of a neutral court-appointed mediator, like Director Mueller, strongly weighs in favor of finding that the agreement was non-collusive. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946, 948 (9th Cir. 2011) (presence of neutral mediator is a factor weighing in favor of a finding of non-collusiveness). This is particularly true where, as the District Court explained, Director Mueller has "considerable . . . government and private practice experience mak[ing] him uniquely qualified to work with and earn the trust of the parties" to facilitate settlement discussions. (Kangas ER 2543.) *See Rodriguez* v. *W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (stating that, in reviewing a district court's approval of a settlement, the Court "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution").[17]

---

[16] Moreover, after evaluating the options for consumers in their respective states under the Settlement, 44 State Attorneys General supported the Settlement. (Ancona ER 23.)

[17] Director Mueller's experience includes posts as the United States Attorney for the Northern District of California and the Director of the FBI under Presidents George W. Bush and Barack Obama. (*See* Kangas ER 2542.)

D.    **The Settlement Class's Overwhelming Response to the Settlement Is a Strong Indicia of Its Reasonableness**

The class of consumers entitled to participate in the settlement consisted of approximately 490,000 class members.  Remarkably, only 462 members—less than 0.1% of the Class—filed an objection to the Settlement, and only approximately 3,300 persons—less than 1% of eligible class members—submitted exclusions from the class.  (*See* Ancona ER 4.)  The District Court correctly observed that these low opt-out and objection rates strongly supported approval of the Settlement.  (*See* Ancona ER 26.)  *See Churchill Vill., LLC* v. *Gen. Elec.,* 361 F.3d 566, 577 (9th Cir. 2004) (no abuse of discretion where district court approved settlement with 500 opt-outs in a class of 90,000); *Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class . . . stayed in the class" is an "objective [indicator of the settlement's] fairness.").

The settlement class has confirmed the District Court's observations by its overwhelming participation in the Class Action Settlement.  As of June 23, 2017, Volkswagen has reacquired, modified, or otherwise removed from commerce 300,510 vehicles (*i.e.*, over 60% of the Subject Vehicles) and has already paid approximately $6.3 billion to consumers as part of the settlement program.  (SER 4, 15-16, 30.)  This progress has been achieved in just the eight months since the District Court approved the Class Action Settlement; yet, class members have until September 2018 to file a claim.  (SER 4; Fleshman ER 1961,

2026.)  This rate of participation further demonstrates that the relief provided in the Class Action Settlement is fair, adequate and reasonable.  *See In re TracFone*, 112 F. Supp. 3d at 1006 (class action settlement with a claim rate of 30% was fair, adequate and reasonable).

## II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN OVERRULING FLESHMAN'S OBJECTION TO THE SETTLEMENT

### A.  Standard of Review

Appellate review of a district court's order approving a class action settlement "is extremely limited, and [the Court] will set aside that determination only upon a 'strong showing' that the district court's decision was a clear abuse of discretion." *Lane*, 696 F.3d at 818.

### B.  No Government Has Taken Any Action, or Even Expressed the Intention, to Penalize Consumers for Continued Operation of the Vehicles

Despite Fleshman's insistence that the continued operation of the Subject Vehicles exposes consumers to criminal and civil liability, he has not offered any evidence to suggest that any government authority has concluded that the vehicles are illegal to drive and intends to prosecute consumers operating any of the vehicles.  Indeed, in his opening brief, Fleshman acknowledges that "no Court has specifically held these vehicles are illegal to import, sale, and use." (Fleshman Br. 51.)

The record also reflects that the vehicles are not in fact illegal to drive. The EPA has informed "[c]ar owners . . . that although these vehicles have emissions exceeding standards, those violations do not present a safety hazard and the cars remain legal to drive." (Fleshman ER 924.) CARB has similarly explained that "[c]ar owners should know that although these vehicles have emissions exceeding standards, these violations do not present a safety hazard and the cars remain legal to drive and resell." (SER 692.)

Given Fleshman's failure to provide the district court with any evidence that any federal or state authorities have declared the vehicles illegal to drive, the EPA's and CARB's clear declinations to sanction individual consumers for continuing to drive the offending vehicles, the determination of a Virginia state court that "Virginia has [not] declared the vehicles not to be road worthy or otherwise illegal" (Fleshman ER 1043), and that the "44 states participating in the Attorneys General settlement have also agreed to allow [the] vehicles to stay on the road pending participation in the [Consumer] Class Action Settlement" (Fleshman ER 40), the district court properly concluded that the record was devoid of any evidence that any "federal or state authority has declared the Class Vehicles illegal to drive." (Fleshman ER 40.) Accordingly, the district court did not abuse its discretion by overruling Fleshman's unsubstantiated and speculative objection.

C.    **The Vehicles Are Not Illegal to Drive Under Virginia Law**

Fleshman's contention that Section 5-40-5670(A)(3) of the Virginia Administrative Code ("Virginia Provision"), which states "no motor vehicle or engine shall be operated with the motor vehicle pollution control system or device removed or otherwise rendered inoperable," makes it illegal to drive the vehicles in Virginia (and other states with similar provisions) is expressly foreclosed by the CAA.  (*See* Fleshman Br. 39 (quoting 9 Va. Admin. Code § 5670(A)(3).)

"The CAA makes the [s]tates and the [f]ederal [g]overnment partners in the struggle against air pollution." *Jensen Family Farms, Inc.* v. *Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011).  Under this partnership, the "federal government sets nationwide emissions standards for mobile sources," like "new motor vehicles," *Jensen*, 644 F.3d at 938, but "[t]he direct regulation of emissions from stationary sources is primarily left to the states," *Jensen*, 644 F.3d at 938, which discharge their duty by, *inter alia*, "submitting an implementation plan for such State which will specify the manner in which national . . . air quality standards will be achieved and maintained within . . . such State." *Exxon Mobil Corp.* v. *EPA*, 217 F.3d 1246, 1254-55 (9th Cir. 2000).

"Because the regulation of mobile source emissions is a federal responsibility, Congress has expressly preempted states from setting emissions

standards for mobile sources." *Jensen*, 644 F.3d at 938. Specifically, Section

209(a) of the CAA provides:

> No State or any political subdivision thereof shall adopt
> or attempt to enforce any standard relating to the control
> of emissions from *new motor vehicles* or *new motor
> vehicle engines* subject to this part. No State shall require
> certification, inspection, or any other approval relating to
> the control of emissions from *any new motor vehicle or
> new motor vehicle engine* as condition precedent to the
> initial retail sale, titling (if any), or registration of such
> motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a) (emphasis added); *see also Exxon Mobil*, 217 F.3d at 1255

(explaining that states retain broad powers to regulate air quality with "the

exception of . . . standards for new motor vehicles").[18]

Given this express prohibition, the Virginia Provision on which

Fleshman relies cannot be construed to enforce a standard relating to "new motor

vehicles," as Fleshman necessarily contends. *See Jensen*, 644 F.3d at 938; *Sims* v.

*Fla. Dept. of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1455 (11th Cir.

1989) ("The express language in section 7543(a) indicates Congress's intent to

---

[18] The CAA creates only one exception to total federal control of new motor
vehicle emissions and engines: California and states that enact emissions regimes
"identical" to California's may adopt their own standards and enforcement
procedures, 42 U.S.C. § 7507, if the EPA "determines that the State standards will
be, in the aggregate, at least as protective of public health and welfare as applicable
Federal standards." 42 U.S.C. § 7543(b)(1). This exception is not implicated here
because, inter alia, Virginia has not adopted standards identical to California's
standards.

exclusively regulate the control of new motor vehicle emissions prior to their initial sale."). The Virginia Provision can only be interpreted to prohibit customer tampering of the emissions systems after the vehicle's initial sale. *See Sims*, 862 F.2d at 1455 n.8 (noting that Section 209(d) of the CAA has been construed as "allow[ing] the state to regulate automobile use and operation *subsequent* to the initial sale" (emphasis added)). Accordingly, the District Court did not abuse its discretion overruling this objection to the Settlement. (*See also* Fleshman ER 1043 (observing that "neither the EPA nor Virginia has declared the vehicles not to be road worthy or otherwise illegal").)

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING PARTL'S BELATED MOTION TO OPT OUT OF THE SETTLEMENT

Partl contends that the District Court abused its discretion in denying her motion to belatedly opt out of the Settlement because her mistaken belief that she could opt out of the Settlement by registering on Volkswagen's website constitutes "excusable neglect." (Partl Br. 4-15.) Partl's contention should be rejected, and the Court should affirm the Partl Belated Opt-Out Order.

### A. Standard of Review

A district court's "[d]enial [of a] motion to opt out of the class is reviewed for abuse of discretion." *Silber* v. *Mabon*, 18 F.3d 1449, 1453 (9th Cir. 1994). "The scope of appellate review of the district court's disallowance of a late

claim is narrow. In reviewing the [district] court's exercise of its discretion, [the Ninth Circuit will] not substitute [its judgment] for th[at] of the district judge" simply because it would have reached a different result. *Id*. at 1455. Indeed, "in the absence of evidence that [the district judge] acted arbitrarily," the district court's decision should be affirmed. *Id*.

## B. Partl's Failure to Follow the Clear Opt-Out Procedure Described in the Notice Does Not Constitute Excusable Neglect

A class member may opt out of a class action settlement after the opt-out deadline has passed only upon a showing of "excusable neglect" or good cause for the delay. *Silber*, 18 F.3d at 1455. In determining whether "excusable neglect" or good cause exists, this Court considers:

> the degree of compliance with the best practicable notice procedures; when notice was actually received and if not timely received, why not; what caused the delay, and whose responsibility was it; how quickly the belated opt out request was made once notice was received; how many class members want to opt out; and whether allowing a belated opt out would affect either the settlement or finality of the judgment.

*Silber*, 18 F.3d at 1455; *accord Brannon* v. *Household Int'l Inc.*, 236 F. App. 285, 287 (9th Cir. 2007). Applying these factors (Partl ER 40-41), the District Court determined that Partl had received timely notice of the Settlement, which clearly explained that consumers "must mail [their] exclusion request" to the claims administrator. (Partl ER 40-41.) Thus, the District Court concluded that her

failure to "comply with the terms of the Settlement [did] not constitute good cause or excusable neglect." (Partl ER 41.)

The district court's judgment was a proper exercise of its discretion for a number of reasons:

*First,* Partl's affidavit in support of her motion in the District Court indicated that she received timely notice of the Settlement, but nonetheless failed to follow the opt-out procedures set forth therein. (*See* Partl ER 6-7.) This militates against a finding of excusable neglect. *See In re Charles Schwab Corp. Sec. Litig.*, 2011 WL 855817, at *2 (N.D. Cal. Mar. 9, 2011) (declining to allow belated opt out where notice provided to class member "was reasonably calculated to give him actual notice"); *Brannon*, 236 F. App. at 287 (movant failed to demonstrate excusable neglect where he received "actual notice of the class settlement prior to the opt out deadline").

*Second*, although Partl received notice of the Settlement on August 7, 2016, she did not move to opt out until October 17, 2016—*i.e.*, the eve of the final settlement approval hearing. Such a delay further supports the district court's denial of her belated opt-out motion. *See In re Charles Schwab Corp. Sec. Litig.*, 2010 WL 2178937, at *1 (N.D. Cal. May 27, 2010) (denying opt out request made "on the eve of preliminary approval of a 200 million dollar class-wide settlement"); *Russell* v. *United States*, 2010 WL 1691634, at *4 (N.D. Cal. Apr. 23,

2010) (denying belated opt out request and explaining that, although the request "was only one day late, it was nevertheless late"); *see also Silber*, 18 F.3d at 1455 (noting one of the factors in determining whether there was excusable neglect is "how quickly the belated opt out request was made once notice was received").

Third, although Partl contends that her mistake was excusable because "she misunderstood the instructions within the . . . notice" (Partl Br. 11), this "misunderstanding" cannot constitute excusable neglect where, as here, the notice clearly set forth the instructions for opting out of the Settlement. *See In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1126 & n.1 (9th Cir. 1977) (failure to submit timely claim was not excusable where the class notice clearly stated deadlines and procedure for submitting claim); *Kyle* v. *Campbell Soup Co.*, 28 F.3d 928, 931-32 (9th Cir. 1994) (lawyer's "misconstruction of nonambiguous rules" does not constitute excusable neglect); *Flores* v. *Medifit Corp. Serv. Inc.*, 2017 WL 550212, at *2 (N.D. Cal. Feb. 10, 2017) (denying belated opt out where movant received notice, which clearly explained that "to opt out, you must submit a signed, written request by first-class U.S. mail to the Settlement Administrator," but movant failed to comply with that procedure). Indeed, this Court has expressly stated that "oversight and confusion . . . need not be excused." *Brannon*, 236 F. App. at 288; *see also In re Cathode Ray Tube Antitrust Litig.*, 2014 WL 4446294, at *5 (N.D. Cal. Sept. 8, 2014) ("[O]versight in failing to adequately review notice [of

settlement] . . . is one of the least compelling excuses that can be offered."). Notably, Partl does not explain how or why she "misunderstood" the notice, nor does she claim that the notice was unclear in any way.

*Fourth*, Partl insists that she acted diligently to correct her mistake, because once she learned that she did not properly opt out, she filed her motion in the District Court 17 days later. (Partl Br. 14.) Even if, however, her initial failure to properly opt out of the Settlement constituted excusable neglect (which it does not), she offers no reasonable explanation for her 17-day delay (*see* Partl ER 6-7), which also is inexcusable. *See Kyle*, 28 F.3d at 931-32 (movant failed to demonstrate excusable neglect for filing motion two days after deadline); *In re Cathode Ray Tube Antitrust Litig.*, 2014 WL 4446294, at *5 (movant failed to demonstrate excusable neglect where he waited 12 days to take corrective action).

*Finally*, a district court's discretion to allow a late filed opt-out motion is broad, and this Court will not disturb that ruling absent "evidence demonstrating a clear showing of abuse of discretion." *Silber*, 18 F.3d at 1455. Partl has not offered any such evidence. Indeed, the evidence shows that the District Court acted well within the bounds of its broad discretion. *See Brannon*, 236 F. App. at 288; *see also In re Cathode Ray Tube Antitrust Litig.*, 2014 WL 4446294, at *5.

## C.   Partl's Remaining Contentions Lack Merit

Partl raises a variety of other assertions in support of reversal.  None has merit.

*First*, Partl notes that the District Court stated in the Partl Belated Opt-Out Order that it was "unaware of any . . . process being described on the Settlement Website . . . [that] make[s] [ ] mention of Class Members' ability to request exclusion via the Settlement Website."  (Partl ER 41.)  Partl does *not* dispute that the District Court's statement is entirely correct.  Instead, Partl contends that the District Court's statement somehow shows that the District Court improperly considered facts outside the record.  (Partl Br. 15-17.)  The District Court did no such thing.  The Long Form Notice, which Partl admits she received in her affidavit accompanying her motion, discusses the Settlement Website and the procedures to opt out of the Settlement.  That Long Form Notice also makes clear that to "opt[ ] out of the . . . Settlement . . . [consumers] *must mail a letter or other written document* to the Court-Appointed claims supervisor" and explains that the consumer "*must mail* [his/her] exclusion request, postmarked no later than September 16, 2016, to Opt Out VW Settlement, P.O. Box 57424, Washington, DC 20037." (Partl ER 34 (emphasis added).)  The District Court's statement merely recognizes that there was no means for opting out of the Settlement besides the procedures listed in the Long Form Notice.

*Second*, Partl contends that the District Court erred because there is no evidence of prejudice to Volkswagen. (Partl Br. 7-8.) Prejudice is not one of the factors considered in this Circuit in determining whether to excuse a class member's failure to opt out of a class action settlement. *See Silber*, 18 F.3d at 1455. In any event, a belated opt-out request filed on the eve of a settlement fairness hearing is prejudicial. *See In re Charles Schwab Corp. Sec. Litig.*, 2010 WL 2178937, at *1 (belated opt-out filed on eve of preliminary approval would prejudice defendants because "the settlement was negotiated with the current class membership in mind").[19]

*Finally*, Partl contends that Volkswagen acted inequitably by failing to disclose that she had not opted out of the Settlement during the parties' exchange of settlement information in connection with Partl's state court mediation. (Partl Br. 7.) Partl does not offer any evidence that Volkswagen misrepresented that she had opted out in those discussions. Nor does Partl offer any evidence that Volkswagen knew she had not opted out of the Settlement during that mediation. Partl notes that the parties first exchanged settlement information

_____

[19] Partl claims that Volkswagen is precluded from now arguing prejudice because Volkswagen did not respond to her motion in the District Court to belatedly opt out of the Settlement. (Partl Br. 7-8.) Partl neglects to inform the Court that she filed her motion on October 17, 2016 and the District Court denied it on October 26, 2016, before the 14-day deadline for Volkswagen to respond had passed. *See* N.D. Cal. L. R. 7-3.

on September 19, 2016, which was only three days after the deadline for class members to post-mark their written opt-out requests. Finally, the settlement discussions (and concomitant exchanges of information) occurred after the deadline to opt-out of the Class Action Settlement, and thus Partl could not have suffered any prejudice because, by then, the deadline to opt out of the Settlement had passed.

## CONCLUSION

For the foregoing reasons, Volkswagen respectfully requests that the Court affirm all of the Orders at issue.

Dated: July 5, 2017

Respectfully submitted,

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr.
Sharon L. Nelles
William B. Monahan
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000

*Attorneys for Defendants-Appellees
Volkswagen AG, Volkswagen Group of
America, Inc., and Audi AG*

# STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants-Appellees Volkswagen AG, Volkswagen Group of America, Inc. and Audi AG are aware of 29 related appeals, in addition to the 12 that have been consolidated for the instant briefing (*i.e.* 16-16731, 16-17035, 16-17129, 16-17133, 16-17155, 16-17157, 16-17158, 16-17166, 16-17168, 16-17181, 16-17183 and 16-17185), which are currently pending in this Court and arise from the same multidistrict litigation, *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, And Products Liability Litigation*, No 15-mdl-2672-CRB (N.D. Cal.).  Those appeal numbers are: 16-17060, 17-15512, 17-15632, 17-15742, 17-15835, 17-16018, 17-16020, 17-16066, 17-16067, 17-16068, 17-16089, 17-16092, 17-16099, 17-16123, 17-16124, 17-16128, 17-16130, 17-16131, 17-16132, 17-16156, 17-16157, 17-16158,  17-16170,  17-16172, 17-16180, and 17-16279.

# CERTIFICATION OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 28-4, counsel for Defendants-Appellees Volkswagen AG, Volkswagen Group of America, Inc. and Audi AG (collectively, "Volkswagen") hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) because this brief contains 11,469 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). Counsel's approximation is based on the "Word Count" function of the word-processing program used to draft the enclosed brief.

Counsel for Volkswagen further certifies that this brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated: July 5, 2017

/s/ *William B. Monahan*
William B. Monahan

*Attorney for Defendant-Appellees*
*Volkswagen AG, Volkswagen Group of*
*America, Inc., and Audi AG*

## CERTIFICATE OF SERVICE

I, William B. Monahan, hereby certify that on July 5, 2017, I electronically filed the foregoing Answering Brief of Defendant-Appellees Volkswagen AG, Volkswagen Group of America, Inc., and Audi AG with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 5, 2017

/s/ *William B. Monahan*
William B. Monahan